*In re* APPORTIONMENT OF STATE LEGISLATURE—1982

Docket No. 68777. Argued March 5, 1982 (Calendar No. 1).—Decided
    March 25, 1982. Appeal dismissed by the Supreme Court of the
    United States on October 12, 1982.
    The Constitution of 1963, art 4, §§ 2-6, provides that, following
        each federal decennial census, the Commission on Legislative
        Apportionment shall be convened and shall proceed to district
        and apportion the Senate and the House of Representatives in
        accordance with rules prescribed by the constitution. Should a
        majority of the commission not agree upon a reapportionment
        plan, the Supreme Court, upon submission of proposed plans to
        the Court by members of the commission, shall determine
        which plan complies most accurately with the constitutional
        requirements and order its adoption.
        The rules prescribed by the constitution for districting and
        apportioning the Legislature are based on weighted land area-
        population formulae. Shortly after the adoption of the 1963
        Constitution, the Supreme Court of the United States held that
        such formulae violate the Equal Protection Clause of the
        United States Constitution. Nevertheless, the commission con-
        tinued to function, and in 1964 and 1972 offered proposed
        apportionment plans to the Supreme Court. The Court in each
        instance determined which plan most accurately complied with
        the constitutional requirements and directed its adoption by
        the commission. In neither case, however, did the Court address
        or decide the fundamental question whether the authority of
        the commission or of the Supreme Court under art 4, §§ 2-6,
        continues despite the partial invalidity of the apportionment
        rules following the decision of the Supreme Court of the United
        States. Thus, because that fundamental question was not con-

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur 2d, Courts § 190.
[2] 25 Am Jur 2d, Elections §§ 16, 29.
[3] 25 Am Jur 2d, Elections § 17.
[3, 8] 25 Am Jur 2d, Elections § 32.
[4, 7] 25 Am Jur 2d, Elections § 17.
[5] 25 Am Jur 2d, Elections §§ 17, 18.
[6] 25 Am Jur 2d, Elections § 27.
[9] 25 Am Jur 2d, Elections §§ 13, 17-19.

sidered by the Supreme Court of Michigan, the Court's actions in the 1964 and 1972 apportionment decisions are not precedentially binding.

On February 12, 1982, the Commission on Legislative Apportionment advised the Supreme Court that it had failed to agree upon a plan, and members of the commission submitted proposed plans to the Court. The Court established a procedure for filing plans and requested briefs and oral argument on the questions: (1) whether the authority of the commission and the Court continues despite the invalidation of the weighted land area-population formulae, and (2) if the authority continues, what standards govern the districting and apportioning of the Legislature.

Following briefing and argument, in a unanimous opinion per curiam the Supreme Court *held:*

The apportionment provisions of art 4, §§ 2-6, cannot be maintained. The invalidation of the weighted land area-population apportionment formulae invalidated all the apportionment rules because they are inextricably intertwined. The commission cannot survive without apportionment rules. However, it is the responsibility of the Supreme Court to provide for the continuity of government by assuring that the people will be provided the opportunity to elect a lawfully apportioned Legislature in the 1982 election. Therefore, the Court directs the drawing of election districts in a manner compliant with federal constitutional requirements consistent with the constitutional history of Michigan. The resulting plan, following submission to and approval by the Court, shall stand until the Legislature and the Governor or the people provide an alternate plan by law.

1. It is the duty of the Supreme Court, under the constitutional provision for the exercise of judicial power, to determine the requirements of the Michigan Constitution and to define the meaning of those requirements in specific applications. The term "constitutional requirements" as used in art 4, § 6, means the requirements set forth in art 4, §§ 2-6, of the 1963 Constitution which are not violative of the United States Constitution, but does not include the requirements of the United States Constitution.

2. The 1963 Constitution did not contemplate that the commission would district and apportion the Legislature in accordance with the requirements of the United States Constitution and the concept that legislative districts should be equal in population. Rather, it contemplated substantial population inequality between the districts resulting from apportionment

according to the weighted land area-population formulae. Election district lines were to be drawn along county lines without regard to whether more equality in population might be achieved by a different method. Considerations of equality and the preservation of other constitutional rights recognized and articulated elsewhere in the constitution were subordinated to the criteria set forth in art 4, §§ 2-6, insofar as apportionment was concerned. In adopting the 1964 and 1972 apportionment plans, the Supreme Court erred in proceeding on the premise that the least population differential between legislative districts was the primary "constitutional requirement" within the meaning of art 4, §§ 2-6. While that is the core concept emanating from the Equal Protection Clause of the United States Constitution, it is not a requirement of art 4, §§ 2-6.

3. The apportionment factors and rules which take into account land area as well as population can no longer be regarded as effectual constitutional requirements because they produce divergence in population from the goal of equality exceeding the range of allowable divergence under the United States Constitution. Other criteria for apportionment set forth in the 1963 Constitution, however, viz.: (1) county, township, and city boundary lines, (2) preservation of existing senatorial districts, and (3) contiguity, convenience, compactness, rectangularity, uniformity, and squareness of election districts, express rational and legitimate state policies which justify divergence from the federal goal of strict population equality, and therefore can be implemented consistently with the Equal Protection Clause of the United States Constitution, but only to the degree of divergence not in excess of 16.4% essential to achievement of the state goals.

4. The Supreme Court of the United States has declared that some aspects of the method chosen by the people are violative of the federal constitution. Those apportionment rules which violate the Equal Protection Clause are not severable from the rules which do not. Likewise, the commission, which is dependent on the rules is not severable from the invalidated rules and cannot survive without them. It is not for the Supreme Court of Michigan to speculate on what the people would decide with respect to the manner in which apportionment should be accomplished, and the matter should be returned to the political process in a manner which highlights rather than hides the choices which the people should make.

5. The power to redistrict and reapportion the Legislature remains with the people. The people, however, can only exercise that power, as a practical matter, by amending the consti-

tution, which is difficult and time-consuming. In the meantime, there must be a Legislature, and federal constitutional requirements must be observed. Until the people indicate their preference, the Supreme Court must provide for the redistricting and apportioning of the Legislature in compliance with federal constitutional requirements and in a manner most consistent with the constitutional history of Michigan. That history contains dominant commitments to contiguous, single-member districts drawn along boundary lines of local units of government. Accordingly, the Supreme Court directs that election districts shall be drawn so as to preserve county lines with the least cost to the federal principle of equality of population between election districts without exceeding the range of allowable divergence. Where it is necessary to break county lines, the fewest number of townships necessary to reduce the population divergence shall be shifted. Election district lines within counties entitled to more than one senator or representative, likewise shall be drawn so as to preserve city and township lines, with a shift of population between districts where necessary to break such lines so as to remain within the range of divergence. Where cities and townships are entitled to more than one senator or representative, election districts shall be drawn to achieve maximum compactness within a range of 98%-102% of absolute equality.

6. The Supreme Court appoints Bernard J. Apol, with the assistance of the professional staff and facilities of the office of the Secretary of State, to supervise the drawing of and submission to the Court for approval a districting and apportioning plan consistent with these requirements. Upon receipt of the plan, the Court will hold a public hearing before ordering adoption.

7. The Legislature may, by a statute approved by the Governor with immediate effect at least four weeks preceding the filing date for the August, 1982, primary election, redistrict and reapportion the Legislature consistent with federal and state constitutional requirements, and such a statutory redistricting and reapportionment plan shall supersede the plan directed to be drawn by the Court.

The Court denied a motion for rehearing on May 21, 1982.

Justice Levin, joined by Justice Fitzgerald, fully concurred in the order denying rehearing and wrote a statement addressing the allegations raised in the motion.

1. They noted that while the range of departure from the goal of population equality permitted by the Supreme Court of the United States under the Fourteenth Amendment pertained

to apportionment plans adopted by a state legislature, and higher standards were required of "court-ordered" plans, the court-ordered plans considered by the Supreme Court of the United States were plans ordered by federal courts. The cases involving federal court-ordered plans did not hold that all plans drawn according to criteria ordered by a "court" or by a person or body designated by a court are automatically constitutionally suspect if they produce substantial deviation from population equality. Rather, because of the risk that legitimate state policies would be ignored or misunderstood when a federal court apportions a state legislature, and to limit encroachment on state sovereignty, the Supreme Court of the United States in the exercise of its supervisory power limited the discretion of federal courts by requiring greater population equality in federal court-ordered plans. That concern is not present where a state court orders a plan.

2. Even if the Apol plan would be considered a "court-ordered" plan within the meaning of federal case law, it is not invalid under the federal criteria. The Supreme Court of the United States held that a 20% deviation from population equality was not invalid per se, but would be invalid in the absence of significant state policies or other acceptable considerations which would require adoption of the plan. Where there is more than *de minimis* variation from population equality, it is the responsibility of the apportioning court to articulate precisely why a plan with minimum population variations could not be adopted because of important and significant state considerations which rationally mandate departure from equality. It is clear that even a federal court may depart from the standard of population equality to achieve a state goal. The Supreme Court of Michigan identified the state goal of preserving local boundary lines. Accordingly, a federal court could apportion the Michigan Legislature to achieve that goal if all state bodies failed to act. A plan is "state-ordered" for purposes of applying the federal rule regardless whether it is drawn by a legislature, an apportionment board or commission, or some other person, agent, or authority deriving authority from a state's constitution, a statute, or an opinion of a state court. The crucial question is whether the plan was drawn to comply with state and federal law or only with federal law.

3. The challenge to the Apol plan on the ground that its average deviation from population equality exceeded that of the plan approved by the Supreme Court of the United States is without precedential support. That Court has looked to the range of divergence rather than the average deviation. The

higher average deviation of the Apol plan results from adherence to the state goal and is not a reason to depart from that goal. There is no reason to anticipate that the Supreme Court of the United States would impose a limitation on the average deviation. Average or median deviation may be a factor where the *de minimis* rule is sought to be invoked, but does not affect a case where departures from absolute equality are justified on state policy grounds.

4. Throughout the course of Michigan history, populous counties have been subdivided and less populous counties have been combined, resulting in county lines remaining inviolate. The reason for the use of counties was not the political unit theory of representation, but the constitutional requirement of preservation of electoral autonomy of local political subdivisions. Because Michigan also has a history of population-based apportionment expressed in its constitutions, the Court's articulation of the state policy of maintaining the integrity of its political subdivisions cannot be said to be a misstatement of Michigan constitutional history. No Michigan Constitution has provided for the allocation of legislative seats on a purely population basis, or has permitted the breaking of a single county line. The Court's method of apportionment—indirect apportionment by minimizing county line breaks statewide—yields admittedly arbitrary results. That, however, is its principal virtue: it provides an objective and neutral resolution to an intractable problem. The variation from population equality which results from the Apol plan is within the range established by the Court, breaks the fewest county lines, and shifts the fewest cities and townships and the fewest people.

5. In all events the Court has provided the parties an opportunity for argument and has carefully considered the arguments advanced. The Court has retained jurisdiction with a view to ordering such changes as may be required to overcome defects in the plan, to provide for an orderly election, and to enable compliance with any superseding opinion.

A final order adopting an apportionment plan was entered on May 21, 1982.

Justice Moody dissented from the Court's final order. He would hold that the law requires a closer adherence to the constitutional principle of one person-one vote.

1. The Court should approve a plan which would adhere to our duty to establish population as the controlling criterion in apportionment controversies. The extreme population divergence allowed in the plan approved by the Court, as applied in this state and in this case, instead of being the exception

became commonplace. An unfolding of the Court's plan resulted in average percentage variations from perfect equality substantially greater than previously allowed in federal cases. A great number of the districts have a substantial deviation from the ideal-sized district and fall near the extremes of allowable divergence. This result cannot be squared with the overriding constitutional objective of substantial equality of population among districts.

2. The apportionment criteria should strive to create districts as equal, not as unequal, as possible. Rigid adherence to the criteria concerning population deviation and county lines is unnecessary when modifications may be made to comport substantially closer with the primary principle of population equality. Population equality within acceptable limits should take precedence over unbroken county lines. The Court cannot supersede the constitutional principle of substantial equality among election districts under the guise of state policy. Sufficient time was available to devise a modified plan which followed the boundary line criteria outlined in the Court's opinion, but which permitted only *de minimis* deviation from population equality.

1. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — PRECEDENT — QUESTIONS DECIDED.

Decisions of the Supreme Court which assumed, without addressing or definitely considering the question, that the Commission on Legislative Apportionment and the Supreme Court continued to have authority under the Constitution of 1963 to establish and determine legislative election districts despite partial invalidation of the constitutional apportionment rules by the United States Supreme Court, and which did not definitively consider the constitutional requirements for districting and apportioning the Legislature, are not precedentially binding (Const 1963, art 4, §§ 2-6).

2. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — EQUAL PROTECTION.

The Equal Protection Clause does not require that a state, in districting and apportioning its Legislature, subordinate altogether rational, legitimate goals such as preserving the integrity of its political subdivisions to the goal of population equality; the state must make an honest, good-faith effort to construct election districts as nearly of equal population as possible with a range of divergence from the goal of population equality no greater than 16.4% (US Const, Am XIV).

3. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — EQUAL PROTECTION — WORDS AND PHRASES.

The term "constitutional requirements" as used in the section of the Constitution of 1963 which provides for the Supreme Court to determine which plan of apportionment submitted by members of the Commission on Legislative Apportionment complies most accurately with the constitutional requirements, means the requirements set forth in art 4, §§ 2-6, of the Constitution of 1963 with respect to apportionment which are not violative of the Equal Protection Clause of the United States Constitution; it does not refer to the Equal Protection Clauses of either the United States or Michigan Constitutions or to any other provision of the Michigan Constitution (US Const, Am XIV; Const 1963, art 1, § 2; art 4, §§ 2-6).

4. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — EQUAL PROTECTION.

The provisions of the Constitution of 1963 which establish weighted land area-population formulae for the districting and apportioning of the Legislature without regard to the goals of achieving equality of population within election districts and avoidance of discrimination are invalid as violative of the Equal Protection Clause of the United States Constitution (US Const, Am XIV; Const 1963, art 4, §§ 2, 3).

5. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — EQUAL PROTECTION.

The requirements of the state constitution that the boundary lines of political subdivisions should be observed in districting and apportioning the Legislature and that election districts should be compact and contiguous, are not violative of the Equal Protection Clause of the United States Constitution, so long as the resulting districts do not diverge from the goal of equality of population between districts more than 16.4% (US Const, Am XIV; Const 1963, art 4, §§ 2-6).

6. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — EQUAL PROTECTION.

Divergence by a state apportioning authority from the federal goal of population equality between election districts is permitted only to the extent necessary to permit achievement of rational, legitimate state goals such as preserving the integrity of the state's political subdivisions, but not more than 16.4%; the range of divergence necessary to achieve the state goals is determined separately for the state as a whole when apportioning senators and representatives to counties, for each county

when so apportioning within a county, and for each city and township entitled to more than one senator or representative when apportioning in them.

7. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — EQUAL PROTECTION.

The apportionment provisions of the Constitution of 1963 are interdependent and not severable and, because the weighted land area-population formulae were held to be invalid under the Equal Protection Clause of the United States Constitution by the United States Supreme Court, the provisions must be invalidated in their entirety; because the constitution provides for apportionment only in accordance with the rules prescribed by the constitution, the Commission on Legislative Apportionment cannot survive upon their invalidation (US Const, Am XIV; Const 1963, art 4, §§ 2-6).

8. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — SUPREME COURT.

The power to district and apportion the Legislature rests with the people; however, because the people, upon the invalidation of the state constitutional apportionment rules by the Supreme Court of the United States, cannot immediately indicate their preference, the Supreme Court of Michigan must provide for the continuity of government by assuring that the people will be provided the opportunity to elect a lawfully apportioned Legislature in an imminent election and, accordingly, until the people or their representatives act, must provide for the districting and apportioning of the Legislature in compliance with federal constitutional requirements and in a manner most consistent with the constitutional history of the state.

9. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE.

Throughout the constitutional history of Michigan, the dominant commitment in districting and apportioning the Legislature has been to contiguous, single-member election districts drawn along the boundary lines of local units of government which, within those limitations, are as compact as feasible; accordingly, districting and apportioning of the Legislature following each federal decennial census of the state must involve drawing of election districts so as to preserve the boundary lines of local units of government with the least cost to the federal principle of equality of population between districts, the divergence not to exceed 16.4%.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gary P. Gordon,* Assistant Prosecuting Attorney, for the Attorney General.

*Lewis, Adams, Goodrich & Tait* (by *Robert L. Henry, Jr.),* for Republican members of the Apportionment Commission.

*Marston, Sachs, Nunn, Kates, Kadushin & O'Hare, P.C.* (by *Theodore Sachs),* for Democratic members of the Apportionment Commission.

*Robert A. Sedler, Edward J. Littlejohn,* and *Hall & Bilicki, P.C.* (by *Elliott S. Hall),* for Coleman A. Young, Mayor of the City of Detroit, and for the National Association for the Advancement of Colored People.

*Miguel Ortiz* for Southwest Committee for Fair Representation.

Per Curiam. The Constitution of 1963, art 4, §§ 2-6, provides that, following the decennial census, the Commission on Legislative Apportionment[1] shall establish House and Senate districts in accordance with rules there prescribed for districting and apportionment. If a majority of the commission cannot agree upon a reapportionment plan, then, upon submission of plans to this Court by members of the commission, this Court shall determine which plan complies most accurately

---

[1] The commission, consisting of eight persons, four selected by the state organizations of each of the two major political parties, is empowered to "district and apportion the senate and house of representatives according to the provisions of this constitution". Const 1963, art 4, § 6.

See fn 2 for complete text of § 6.

with "the constitutional requirements" and order its adoption.[2]

---

[2] If there is a failure to agree on a plan, each member of the commission may submit a proposed plan to this Court.

Within 60 days after final publication of a plan, on application of any elector, this Court, in the exercise of original jurisdiction, may direct the commission to perform its duties, may review any final plan adopted by the commission, and shall remand such plan to the commission for further action "if it fails to comply with the requirements of this constitution".

The following is the complete text of art 4, § 6.

"Commission on legislative apportionment.

"Sec. 6. A commission on legislative apportionment is hereby established consisting of eight electors, four of whom shall be selected by the state organizations of each of the two political parties whose candidates for governor received the highest vote at the last general election at which a governor was elected preceding each apportionment. If a candidate for governor of a third political party has received at such election more than 25 percent of such gubernatorial vote, the commission shall consist of 12 members, four of whom shall be selected by the state organization of the third political party. One resident of each of the following four regions shall be selected by each political party organization: (1) the upper peninsula; (2) the northern part of the lower peninsula, north of a line drawn along the northern boundaries of the counties of Bay, Midland, Isabella, Mecosta, Newaygo and Oceana; (3) southwestern Michigan, those counties south of region (2) and west of a line drawn along the western boundaries of the counties of Bay, Saginaw, Shiawassee, Ingham, Jackson and Hillsdale; (4) southeastern Michigan, the remaining counties of the state.

"Eligibility to membership.

"No officers or employees of the federal, state or local governments, excepting notaries public and members of the armed forces reserve, shall be eligible for membership on the commission. Members of the commission shall not be eligible for election to the legislature until two years after the apportionment in which they participated becomes effective.

"Appointment, term, vacancies.

"The commission shall be appointed immediately after the adoption of this constitution and whenever apportionment or districting of the legislature is required by the provisions of this constitution. Members of the commission shall hold office until each appointment or districting plan becomes effective. Vacancies shall be filled in the same manner as for original appointment.

"Officers, rules of procedure, compensation, appropriation.

"The secretary of state shall be secretary of the commission without vote, and in that capacity shall furnish, under the direction of the

The rules prescribed by the 1963 Constitution for districting and apportioning the Legislature are based on weighted land area/population formulae.[3] Shortly after the adoption of the 1963

---

commission, all necessary technical services. The commission shall elect its own chairman, shall make its own rules of procedure, and shall receive compensation provided by law. The legislature shall appropriate funds to enable the commission to carry out its activities.

"Call to convene; apportionment; public hearings.
"Within 30 days after the adoption of this constitution, and after the official total population count of each federal decennial census of the state and its political subdivisions is available, the secretary of state shall issue a call convening the commission not less than 30 nor more than 45 days thereafter. The commission shall complete its work within 180 days after all necessary census information is available. The commission shall proceed to district and apportion the senate and house of representatives according to the provisions of this constitution. All final decisions shall require the concurrence of a majority of the members of the commission. The commission shall hold public hearings as may be provided by law.

"Apportionment plan, publication; record of proceedings.
"Each final apportionment and districting plan shall be published as provided by law within 30 days from the date of its adoption and shall become law 60 days after publication. The secretary of state shall keep a public record of all the proceedings of the commission and shall be responsible for the publication and distribution of each plan.

"Disagreement of commission; submission of plans to supreme court.
"If a majority of the commission cannot agree on a plan, each member of the commission, individually or jointly with other members, may submit a proposed plan to the supreme court. The supreme court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section.

"Jurisdiction of supreme court on elector's application.
"Upon the application of any elector filed not later than 60 days after final publication of the plan, the supreme court, in the exercise of original jurisdiction, shall direct the secretary of state or the commission to perform their duties, may review any final plan adopted by the commission, and shall remand such plan to the commission for further action if it fails to comply with the requirements of this constitution."

[3] The 1963 Constitution provides that both the Senate and the House are to be elected from single-member districts.

### THE SENATE

In districting the state for the purpose of electing senators, each

county is assigned apportionment factors which are based 20% on land area and 80% on population.

In the less populous counties, those with less than 13 apportionment factors, the counties are to be arranged into senatorial districts that are compact, convenient, and contiguous by land, as rectangular in shape as possible, and having as nearly as possible 13 apportionment factors, but in no event less than 10 or more than 16. Insofar as possible, "existing senatorial districts at the time of reapportionment shall not be altered unless there is a failure to comply with the above standards".

In counties with 13 or more apportionment factors (entitled to one or more senators), one senator is assigned to each county, and the balance of those assigned to those counties as a class are assigned among them in accordance with the "method of equal proportions".

In counties which are assigned two or more senators, the population of the senatorial districts "shall be as nearly equal as possible but shall not be less than 75 percent nor more than 125 percent" of the ideal district, and each district "shall follow incorporated city or township boundary lines to the extent possible and shall be compact, contiguous, and as nearly uniform in shape as possible".

The complete text of § 2, concerning the districting and apportionment of the Senate, is as follows:

"Senators, number, term.

"Sec. 2. The senate shall consist of 38 members to be elected from single member districts at the same election as the governor for four-year terms concurrent with the term of office of the governor.

"Senatorial districts, apportionment factors.

"In districting the state for the purpose of electing senators after the official publication of the total population count of each federal decennial census, each county shall be assigned apportionment factors equal to the sum of its percentage of the state's population as shown by the last regular federal decennial census computed to the nearest one-one hundredth of one percent multiplied by four and its percentage of the state's land area computed to the nearest one-one hundredth of one percent.

"Apportionment rules.

"In arranging the state into senatorial districts, the apportionment commission shall be governed by the following rules:

"(1) Counties with 13 or more apportionment factors shall be entitled as a class to senators in the proportion that the total apportionment factors of such counties bear to the total apportionment factors of the state computed to the nearest whole number. After each such county has been allocated one senator, the remaining senators to which this class of counties is entitled shall be distributed among such counties by the method of equal proportions applied to the apportionment factors.

"(2) Counties having less than 13 apportionment factors shall be entitled as a class to senators in the proportion that the total

apportionment factors of such counties bear to the total apportionment factors of the state computed to the nearest whole number. Such counties shall thereafter be arranged into senatorial districts that are compact, convenient, and contiguous by land, as rectangular in shape as possible, and having as nearly as possible 13 apportionment factors, but in no event less than 10 or more than 16. Insofar as possible, existing senatorial districts at the time of reapportionment shall not be altered unless there is a failure to comply with the above standards.

"(3) Counties entitled to two or more senators shall be divided into single member districts. The population of such districts shall be as nearly equal as possible but shall not be less than 75 percent nor more than 125 percent of a number determined by dividing the population of the county by the number of senators to which it is entitled. Each such district shall follow incorporated city or township boundary lines to the extent possible and shall be compact, contiguous, and as nearly uniform in shape as possible."

### The House

In districting the state for the purpose of electing members of the House of Representatives, "districts shall consist of compact and convenient territory contiguous by land".

A formula, also taking into account land area, provides for the assignment of representatives among the counties. Each county having a population of not less than 0.7% of the population of the state constitutes a separate representative area, and the balance of the representatives are assigned in accordance with the "method of equal proportions". Counties entitled to more than one representative shall be divided into districts with a population "as nearly as equal as possible" containing not less than 75% nor more than 125% of the ideal population and such districts "shall follow city and township boundaries where applicable and shall be composed of compact and contiguous territory as nearly square in shape as possible".

A representative area consisting of more than one county, entitled to more than one representative, is to be divided into single-member districts "as equal as possible in population, adhering to county lines".

The complete text of § 3, concerning the districting and apportionment of the House, is as follows:

"Representatives, number, term; contiguity of districts.

"Sec. 3. The house of representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population as provided in this article. The districts shall consist of compact and convenient territory contiguous by land.

"Representative areas, single and multiple county.

"Each county which has a population of not less than seven-tenths of one percent of the population of the state shall constitute a separate representative area. Each county having less than seven-tenths of one percent of the population of the state shall be combined

Constitution and after the decision, on June 15, 1964, of the United States Supreme Court in *Reynolds v Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964), those formulae were held to be violative of the Equal Protection Clause of the Constitution of the United States.[4]

with another county or counties to form a representative area of not less than seven-tenths of one percent of the population of the state. Any county which is isolated under the initial allocation as provided in this section shall be joined with that contiguous representative area having the smallest percentage of the state's population. Each such representative area shall be entitled initially to one representative.

"Apportionment of representatives to areas.

"After the assignment of one representative to each of the representative areas, the remaining house seats shall be apportioned among the representative areas on the basis of population by the method of equal proportions.

"Districting of single county area entitled to 2 or more representatives.

"Any county comprising a representative area entitled to two or more representatives shall be divided into single member representative districts as follows:

"(1) The population of such districts shall be as nearly equal as possible but shall not be less than 75 percent nor more than 125 percent of a number determined by dividing the population of the representative area by the number of representatives to which it is entitled.

"(2) Such single member districts shall follow city and township boundaries where applicable and shall be composed of compact and contiguous territory as nearly square in shape as possible.

"Districting of multiple county representative areas.

"Any representative area consisting of more than one county, entitled to more than one representative, shall be divided into single member districts as equal as possible in population, adhering to county lines."

Art 4, § 4 concerns "annexation or merger with a city" and § 5 concerns "island areas, contiguity".

[4] In *Marshall v Hare,* 227 F Supp 989 (ED Mich, 1964), a three-judge court, upon consideration of arguments based on *Baker v Carr,* 369 US 186; 82 S Ct 691; 7 L Ed 2d 663 (1962), held that the weighted land area/population formulae were not violative of the Equal Protection Clause.

After *Reynolds v Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964), was decided, the United States Supreme Court, on June 22, 1964, reversed by brief order on the authority of *Reynolds v Sims* and said:

The Commission on Legislative Apportionment nevertheless continued to function. After *Reynolds v Sims,* on June 22, 1964, and, following the 1970 census, again on May 4, 1972, this Court chose between plans offered by members of the commission and declared that the plan so chosen most accurately complied with "the constitutional requirements" and directed its adoption by the commission.[5]

"The case is remanded for further proceedings consistent with the views stated in our opinions in *Reynolds v Sims* and in the other cases relating to state legislative apportionment decided along with *Reynolds.*"

Justices Clark and Stewart, who concurred in *Reynolds* on separate grounds, stated that they "would affirm the judgment because the Michigan system of legislative apportionment is clearly a rational one and clearly does not frustrate effective majority rule." Justice Harlan dissented for the reasons stated in his dissenting opinion in *Reynolds v Sims. Marshall v Hare,* 378 US 561; 84 S Ct 1912; 12 L Ed 2d 1036 (1964).

[5] Before *Reynolds v Sims,* this Court, on May 26, 1964, ordered the adoption of a plan based upon the presumed validity of the weighted land area/population formulae. See *In re Apportionment of State Legislature—1964,* 372 Mich 418, 480; 126 NW2d 731; 127 NW2d 862; 128 NW2d 350 (1964). After *Reynolds v Sims,* this Court vacated its order of May 26, 1964, and ordered the Commission on Legislative Apportionment to adopt a plan for districting and apportioning the Senate and House of Representatives in accordance with *Reynolds v Sims. In re Apportionment of State Legislature—1964,* 373 Mich 247; 128 NW2d 721 (1964). The commission failed to agree on a plan, and this Court entered an order directing the commission to adopt the Austin-Kleiner plan, the only plan submitted that was not based on the weighted land area/population formulae. *In re Apportionment of State Legislature—1964,* 373 Mich 250; 128 NW2d 722 (1964). A challenge by an elector pursuant to the eighth paragraph of Const 1963, art 4, § 6 was remanded to the commission. *In re Apportionment of State Legislature—1965,* 376 Mich 410; 137 NW2d 495; 138 NW2d 16 (1965). The commission was unable to agree, and the paragraph eight challenge was dismissed pursuant to an order dated April 6, 1966, because a majority of the Court could not agree on other action. *In re Apportionment of State Legislature—1965-1966,* 377 Mich 396, 474; 140 NW2d 436 (1966).

When legislative apportionment was again before this Court, in 1972, after the Commission on Legislative Apportionment failed to agree on a plan, it was not claimed that the 1963 Constitution's apportionment formulae had been validated by subsequent decisions of the United States Supreme Court. See *In re Apportionment of*

However, fundamental questions concerning the commission's and this Court's roles in the apportionment process have yet to be addressed by this Court. One justice in 1964,[6] another justice in 1972,[7] expressed the view that the commission and

*State Legislature—1972*, 387 Mich 442; 197 NW2d 249 (1972). Nor has any such claim been made in the instant proceedings.

We note that the percentages of divergence set forth in the tables appended to the three-judge opinion in *Marshall v Hare, supra,* indicate a disparity of population considerably in excess of the margins upheld by the United States Supreme Court in subsequent decisions. See fn 17, *infra.*

[6] *In re Apportionment of State Legislature—1964,* 373 Mich 250, 257; 128 NW2d 722 (1964) (SOURIS, J.).

[7] *In re Apportionment of State Legislature—1972,* 387 Mich 442, 492; 197 NW2d 249 (1972) (T. G. KAVANAGH, J.).

A petition for rehearing, filed in 1973, was denied in an unpublished order on September 26, 1973; an amended order, dated October 2, 1973, reads as follows:

"On order of the Court, the motions by petitioners Paul G. Goebel, Sr., Ralph E. Huhtala and Anthony C. Licata for relief from final judgment and to designate parties to proceedings are considered, and the same are hereby denied.

"Justice T. G. KAVANAGH would grant review for the reasons set forth in his dissenting opinion in *In re Apportionment of State Legislature—1972,* 387 Mich 442 (1972).

"Justice LEVIN would grant review as he finds persuasive the views expressed by Mr. Justice T. G. KAVANAGH in the 1972 legislative apportionment case and earlier by Mr. Justice SOURIS in *In re Apportionment of State Legislature—1964,* 373 Mich 247, 258 (1964), who concluded that since the provisions in the Michigan Constitution for apportioning and districting both houses of the Michigan Legislature were violative of the United States Constitution, as set forth in the one person-one vote decisions of the United States Supreme Court, the commission on legislative apportionment can no longer 'proceed to district and apportion the senate and house of representatives according to the provisions of this constitution,' (art 4, § 6) and, accordingly, the parts not being severable, the apportionment commission fell with the other provisions.

"Justice COLEMAN would grant review to consider (1) whether the procedure for selecting members of the committee on legislative apportionment as set forth in Const 1963, art 4, § 6 places a heavy and discriminatory burden upon minority parties and independent voters, denying these distinct and substantial elements of the voting public an opportunity to participate in a vital phase of the election process, in violation of the United States Constitution; (2) whether Const 1963, art 4, § 1 impermissibly delegates legislative power; and (3) whether the commission on legislative apportionment and this Court relied solely or unduly upon the erroneous presumption that

this Court's authority is limited to districting according to the apportionment rules prescribed in art 4, §§ 2-6, and that since those rules are no longer wholly valid neither the commission nor this Court can properly act at all. While that view was rejected *sub silentio* when this Court ordered the adoption of plans in 1964 and 1972, no opinion of the Court has addressed or decided the question whether the commission and this Court's authority under art 4, §§ 2-6 continues despite the partial invalidity, under the United States Constitution, of the apportionment rules set forth in the 1963 Constitution.[8] Nor has the Court definitively considered in any opinion what are "the constitutional requirements".[9]

The Court's actions in 1964 and 1972, taken without addressing or definitively considering fundamental questions, are not precedentially binding for it is well-established in this state that "[a] point thus assumed without consideration is of

apportionment of state legislative districts must reflect mathematical equality of population, thus excluding other constitutional considerations (see Const 1963, art 4, §§ 2, 3) and thereby casting doubt upon the constitutional validity of their efforts. See *Mahan v Howell,* 410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973), *Gaffney v Cummings,* 412 US 735; 93 S Ct 2321; 37 L Ed 2d 298 (1973), and *White v Regester,* 412 US 755; 93 S Ct 2332; 37 L Ed 2d 314 (1973)."

[8] Faced with the imminency of the 1964 primary election, it appears that the Court in 1964 simply assumed, without consideration, that the commission's function, the power of its members to submit plans, and this Court's authority, when the members of the commission could not agree, to select the plan which most accurately complies with constitutional requirements continued and that the governing criteria under the Michigan Constitution henceforth would be essentially the one person-one vote standard declared by the United States Supreme Court.

When confronted in 1972 with an impasse between the Democratic and Republican members of the commission, the Court did not reconsider those assumptions. Two of the four justices who signed the 1972 opinion of the Court comprised part of the 1964 majority which had ordered the adoption of the 1964 apportionment plan and thus had, in a sense, already committed themselves on those issues.

[9] See Part II, *infra.*

course not decided". *Allen v Duffie,* 43 Mich 1, 11; ·
4 NW 427 (1880); *People v Aaron,* 409 Mich 672,
722; 299 NW2d 304 (1980).                        ·

Upon receipt, on February 12, 1982, of advice
that the commission had failed to agree upon a
plan, and the submission by members of the com-
mission to this Court of plans, this Court entered
an order establishing a procedure for the filing of
plans and requesting briefs and oral argument on
the questions (1) whether the authority of the
commission and this Court continues despite the
invalidity under the United States Constitution of
some of the apportionment rules, and (2) if the
authority of the commission and this Court contin-
ues, what standards govern districting and appor-
tionment.[10]

We summarize our conclusions as follows:

1. It is this Court's duty under Const 1963, art 6,
§ 1, providing for the exercise of the judicial
power, to determine what are the requirements of ·
this constitution and to define the meaning of
those requirements in specific applications.

2. The term "constitutional requirements"
means the provisions of art 4, §§ 2-6 concerning
the number and terms of office of senators and
representatives, establishing the commission, pro-
viding for the decennial districting and apportion-
ment of the Legislature in accordance with appor-
tionment rules there stated and declaring this

---

[10] The Court's order of February 24, 1982, establishing a procedure
for the filing of further plans and scheduling briefing thereon, di-
rected that briefs be separately and earlier filed on the following
questions:

"a. Do the authority and responsibility of the apportionment com-
mission and this Court survive invalidation of the weighted land/
population formulae, and

"b. If the commission's and this Court's authority and responsibility
are not thereby superseded, what are the 'constitutional require-
ments' within the meaning of Const 1963, art 4, § 6?"

Court's function with regard thereto which are not violative of the Equal Protection Clause of the United States Constitution.

While the Equal Protection Clause of the United States Constitution, as elucidated in *Reynolds v Sims, supra,* requires equality of population in forming election districts, the term "constitutional requirements", as used in art 4, §§ 2-6, does not refer to the Equal Protection Clause of the United States Constitution, the Equal Protection Clause of the Michigan Constitution (Const 1963, art 1, § 2), or any other provision of the Michigan Constitution.

3. The provisions of the second and third paragraphs of art 4, § 2 and of the second paragraph of art 4, § 3, establishing weighted land area/population formulae taking into account land area as well as population (thereby apportioning to less populous areas a larger number of senators and representatives than would be apportioned thereto based on population alone), are invalid under the Equal Protection Clause of the United States Constitution as elucidated in *Reynolds v Sims,* and subsequent decisions of the United States Supreme Court.

4. Standing alone and in the abstract, requirements that county, city and township lines be observed in districting and apportionment, and that election districts be compact, are not violative of the Equal Protection Clause of the United States Constitution as long as the resulting districts do not exceed the "range of allowable divergence" from the federal goal of equality of population.

5. It appears from *Mahan v Howell,* 410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973), that the range of allowable divergence is at least 16.4%.

6. The weighted land area/population formulae, invalidated by *Reynolds v Sims, supra,* and the remaining apportionment rules of art 4, §§ 2-6, are inextricably interdependent and therefore are not severable. Similarly, the function of the commission, which depends on those rules, and indeed the commission itself, are not severable from the invalidated rules.[11]

7. It is this Court's responsibility to provide for the continuity of government by assuring that the people will be provided the opportunity to elect a lawfully apportioned Legislature in the 1982 election.

8. The Court directs the drawing of election districts in a manner compliant with federal constitutional requirements consistent with the constitutional history of this state, and the resulting redistricting and apportionment plan shall stand until the Legislature and the Governor or the people provide by law an alternative plan.

I

The two questions posed to the parties by this

---

[11] Counsel for both parties have cited *Dodge v Austin* (ED Mich, 1975, Docket No. 4-70235), *aff'd* 423 US 886; 96 S Ct 181; 46 L Ed 2d 119 (1975), in support of the proposition that the Commission on Legislative Apportionment survived the invalidation of the weighted land area/population formulae.

In *Dodge v Austin,* a three-judge federal court ruled that this Court had recognized the continuing validity of the commission and concluded therefrom that the commission's existence was severable from the invalidated formulae. That question had not been decided by this Court.

The question before this Court is whether, as a matter of Michigan constitutional law, the invalidity of the weighted formulae makes invalid the language establishing the commission and this Court's role in regard thereto. All that the federal court could properly hold was that the concept of this apportionment commission was not violative of the federal constitution. The question whether provisions of the Michigan Constitution are severable cannot be foreclosed by a decision of a federal court, even though affirmed by the United States Supreme Court, because the Michigan Supreme Court has the ultimate responsibility for determining a question of state law.

Court and stated above—severability and standards—are interrelated. In deciding whether the commission and this Court's authority under art 4, §§ 2-6 survive the partial invalidity, under the United States Constitution, of the districting and apportionment rules, the Court is obliged to examine the function of the commission in the wake of *Reynolds v Sims.* This in turn requires that the Court determine the standards by which the commission was governed before and after *Reynolds v Sims.*

## II

The 1972 opinion of this Court declared, based on its understanding of *Reynolds v Sims* and subsequent decisions of the United States Supreme Court, that the apportionment plan with the least population differentials from the ideal was the one which most complied with the "constitutional requirements" of the 1963 Constitution.

The Court's perception of federal constitutional standards would shortly prove to be incorrect.[12]

[12] The following is a summary of decisions of the United States Supreme Court on apportionment:

In *Baker v Carr, supra,* the United States Supreme Court considered a claim that the Tennessee legislature was unconstitutionally malapportioned. It had theretofore been thought that such a claim involved a "political question" and was not justiciable. The Court distinguished prior "political question" cases as involving claims arising under the provision of the United States Constitution guaranteeing every state a republican form of government. Because this action was brought under the Equal Protection Clause, the Court held that policy considerations pertinent to the Guaranty Clause were not involved and remanded the cause for further proceedings in the application of equal protection standards.

After the adoption by the people of the 1963 Constitution, the United States Supreme Court held that Georgia's congressional districting was unconstitutional because it was violative of the provision of the United States Constitution requiring that the members of the

The following year, in *Mahan v Howell,* 410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973), the United States Supreme Court ruled that in state legislative apportionment, the state Legislature, or other body entrusted with the function of reapportioning, may within limits—the Court approved a maximum deviation of 16.4%—depart from the goal of population equality in order to achieve other rational, legitimate state goals such as preserving the integrity of political subdivisions of the state.

---

House of Representatives be chosen "by the people". The Court ruled that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's". *Wesberry v Sanders,* 376 US 1, 7-8; 84 S Ct 526; 11 L Ed 2d 481 (1964).

In the landmark case of *Reynolds v Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964), the United States Supreme Court, on June 15, 1964, invalidated Alabama's legislative apportionment. The Court held that the Equal Protection Clause requires that both houses of a bicameral state legislature be apportioned on a population basis, although some deviations would be permitted if based on legitimate considerations incident to the effectuation of a rational state policy.

Five years later, in invalidating the Missouri congressional apportionment, the Court declared that "the 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. See *Reynolds v Sims*". *Kirkpatrick v Preisler,* 394 US 526, 530-531; 89 S Ct 1225; 22 L Ed 2d 519 (1969).

In *Mahan v Howell,* 410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973), the Court, in upholding Virginia's reapportionment plan, drew a distinction between congressional and state legislative apportionment. While population variance is the sole criterion in congressional reapportionment, state legislative plans are allowed greater flexibility. The constitutional tests are different partly because judicial review is based on different sections of the constitution. Minor deviations from precise equality may be justified when caused by the pursuit of a rational state policy.

A few months later in *Gaffney v Cummings,* 412 US 735; 93 S Ct 2321; 37 L Ed 2d 298 (1973), the Court held that the deviations in Connecticut's legislative apportionment were so small as not to require any justification at all. There is a three-tiered review of state legislative apportionment, the Court said. Some plans have population variances so small as to require no justification whatsoever *(Gaffney),* some plans have population variances large enough to require justification *(Mahan),* and some plans have population variances so large that they cannot be justified *(Reynolds).*

## A

The 1972 opinion of the Court declared that "[t]he controlling criterion for judgment in legislative apportionment controversies, involving bicameral state legislatures, under the equal protection clauses of the Federal and state Constitutions is equality of population as nearly as practicable". *In re Apportionment of Legislature—1972,* 387 Mich 442, 453; 197 NW2d 249 (1972). The opinion characterized the statement in *Reynolds v Sims, supra,* that a state may legitimately desire to maintain the integrity of political subdivisions as dictum. Instead, it relied on the stringent equality of population criterion set forth in *Kirkpatrick v Preisler,* 394 US 526; 89 S Ct 1225; 22 L Ed 2d 519 (1969), where the Court rejected avoidance of fragmenting political subdivisions as a legitimate reason for departing from equality in congressional districts.

Although the United States Supreme Court, in *Reynolds,* had noted a difference between congressional and state legislative districting, the 1972 opinion of this Court declined to distinguish *Kirkpatrick* on that ground, stating that "[p]rudence would counsel avoidance" of the problem that might be presented by attempting to confine *Kirkpatrick* to congressional districting. "In end analysis, mathematical exactitude re equality of population is the primary and controlling standard. As between competing plans with *identical* 'equality of population' factors, attention may then be focused upon other considerations such as compactness, shape, etc." *In re Apportionment of Legislature—1972, supra,* 456.[13] (Emphasis added.)

The refusal to give credence to what the 1972

[13] The Court also said:

"While it is not possible to develop detailed constitutional require-

Court called the dictum of *Reynolds v Sims* can no longer be justified. In *Mahan v Howell* the United States Supreme Court said that the constitutionality of a state legislative redistricting plan was "not to be judged by the more stringent standards that *Kirkpatrick* and *Wells [v Rockefeller,* 394 US 542; 89 S Ct 1234; 22 L Ed 2d 535 (1969)] make applicable to congressional reapportionment, but instead by the equal protection test enunciated in *Reynolds v Sims".* Referring to its decision in *Reynolds,* the Court said "we reaffirm its holding that 'the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable * * * [s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature.' " *Mahan v Howell, supra,* 410 US 324-325.

The Court, in *Mahan,* 329, held that the maintenance of the integrity of political subdivision lines of local units of government is a rational state policy. It said that while the resulting 16-odd percent maximum deviation "may well approach tolerable limits", the apportionment plan under review had not "sacrificed substantial equality to justifiable deviations".

The reasoning of the 1972 opinion of this Court

---

ments, there can be no question of the overriding requirement of 'districts, in both houses of its legislature, as nearly of equal population as is practicable'." *In re Apportionment of Legislature—1972,* 387 Mich 458.

has thus been dislodged by the United States Supreme Court. *Kirkpatrick* and the companion case of *Wells,* which dealt with congressional districting, do not control state legislative districting.

We reject as clearly wrong the argument that this Court, having relied on its understanding of *Kirkpatrick* in the 1972 apportionment case, must adhere to that construction in the disposition of this case. The 1972 opinion expressly sought to elucidate and follow the decisions of the United States Supreme Court. Subsequent United States Supreme Court decisions reject the reading adopted by this Court in 1972.

The Equal Protection Clause does not require that the states subordinate altogether a policy of preserving the boundary lines of local units of government to the one person-one vote principle. It can no longer be said that a plan which achieves absolute population equality is necessarily more compliant with the federal constitution than one which takes into account other justifiable state goals. It would be a misconstruction of the Equal Protection Clause for this Court, in the name of *Kirkpatrick,* to fail to implement a state policy of preserving the boundary lines of local units of government. It is our duty under the Supremacy Clause to fully implement, but not to extend beyond its ambit, the Equal Protection Clause.

B

The 1972 opinion failed to distinguish between the requirements of the federal and state constitutions.

We have considered whether the term "constitu-

tional requirements" means (i) provisions of the Michigan Constitution, (ii) only the provisions of art 4, §§ 2-6 of the Michigan Constitution, (iii) provisions of the United States Constitution, or (iv) provisions of both constitutions.

We conclude that the term "constitutional requirements" means the requirements set forth in art 4, §§ 2-6 of the Michigan Constitution which are not violative of the Equal Protection Clause of the United States Constitution.

The pertinent language of art 4, § 6 is:

"The commission shall proceed to district and apportion the senate and house of representatives according to *the provisions of this constitution.*" (Emphasis supplied.) ¶ 5.

If a majority of the commission cannot agree on a plan, each member may submit a proposed plan to this Court which "shall determine which plan complies most accurately with *the constitutional requirements*" (emphasis supplied) and shall direct that the commission adopt it. ¶ 7.

Upon application of any elector filed not later than 60 days after final publication of the plan, this Court may review any final plan adopted by the commission "and shall remand such plan to the commission for further action if it fails to comply with the *requirements of this constitution*". (Emphasis supplied.) ¶ 8.

The first and third of the foregoing formulations expressly speak of "this" constitution. The commission is charged under the first formulation with districting and apportioning according to the provisions of the Michigan ("this") Constitution.

This Court is obligated under the third formulation to remand to the commission if it fails to comply with the requirements of the Michigan ("this") Constitution. In that light, it was not intended to require this Court, in deciding which plan most accurately complied with "the" constitutional requirements, to consider federal as well as state constitutional requirements and then, on petition of an elector under ¶ 8 of § 6, to be obliged to remand to the commission for failure to comply with the Michigan ("this") Constitution's requirements.

The 1963 Constitution did not contemplate that the commission would district and apportion the Legislature in accordance with the requirements of the United States Constitution and the concept that legislative districts should be equal in population. Rather it contemplated substantial population inequality between the districts resulting from apportionment according to the weighted land area/population formulae set forth in art 4, §§ 2-6.

We acknowledge that the 1972 opinion offers support in dictum[14] for the argument that the provisions of art 1, § 2 of the 1963 Constitution are "constitutional requirements" and that thereby there was incorporated, as a constitutional requirement for the purposes of legislative apportionment, this state's Equal Protection Clause which elaborates upon the Fourteenth Amendment: "no person shall be denied the equal protection of the laws; nor shall any person be denied the enjoy-

---

[14] "The controlling criterion for judgment in legislative apportionment controversies, involving bicameral state legislatures, under the equal protection clauses of the Federal *and state Constitutions* is equality of population as nearly as practicable." (Emphasis supplied.) *In re Apportionment of Legislature—1972,* 387 Mich 453.

ment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin."

Nothing, however, could be clearer than that art 4, §§ 2-6 provides that senatorial and house districts were not to be equal in population. Land area as well as population was to be taken into consideration. Election district lines were to be drawn along county lines without regard to whether districts more equal in population might be achieved by a different methodology. Considerations of equality and the preservation of other constitutional rights, recognized and articulated in art 1, § 2 of the 1963 Constitution, were subordinated to the criteria set forth in art 4, §§ 2-6, insofar as apportionment of the Legislature was concerned.

The touchstone of art 4, §§ 2-6 was discrimination; discrimination in favor of less populated areas against the more populated areas. The Legislature was to be apportioned according to the criteria stated in art 4, §§ 2-6 without regard to the goals of achieving equality and the avoidance of discrimination.

In adopting the 1964 and 1972 plans, this Court erred in proceeding on the premise that the least population differential between legislative districts was the primary "constitutional requirement" within the meaning of art 4, §§ 2-6 of the Michigan Constitution. While that is the core concept of *Reynolds v Sims,* a concept emanating from the Equal Protection Clause of the United States Constitution, it is not a requirement of art 4, §§ 2-6.

The term "the constitutional requirements"

means the requirements of art 4, §§ 2-6 of the 1963 Constitution, which are not violative of the United States Constitution, but does not include the requirements of the United States Constitution.

## III

We turn to a consideration of what are the criteria set forth in art 4, §§ 2-6.

## A

The apportionment factors and rules which take into account land area as well as population, because they produce divergence in population from the goal of equality exceeding the range of allowable divergence under the United States Constitution, can no longer be regarded as effectual constitutional requirements.

The other criteria set forth in the 1963 Constitution are (i) county, township and city boundary lines, (ii) equality in population within a range of 75%-125% of the ideal, (iii) preservation of existing senatorial districts, (iv) contiguity, convenience, compactness, rectangularity, uniformity and squareness.

The basic building blocks of the apportionment rules are the counties. The Senate and the House are to be organized into contiguous, single-member districts drawn on county lines.

House districts, in all counties (those entitled to less than one, to one, or to more than one representative) are to consist of compact and convenient territory contiguous by land.

Senate districts in counties entitled to less than

one senator, are to be compact, convenient, and contiguous by land, and as rectangular in shape as possible, preserving existing senatorial districts at the time of reapportionment unless to do so would result in the failure to comply with the other standards.

In counties entitled to more than one senator or representative, House and Senate districts (i) shall be as nearly equal as possible in population, not less than 75% nor more than 125% of the ideal, *and* (ii) shall follow city and township boundary lines "to the extent possible" (for the Senate) and "where applicable" (for the House), *and* (iii) shall be composed of compact and contiguous territory as nearly "uniform" (for the Senate) and "square" (for the House) in shape "as possible".

## B

We are persuaded that all the foregoing criteria, excepting only the 75%-125% range of divergence for population, express rational and legitimate state policies which justify divergence from the federal goal of strict population equality, and which, therefore, can be implemented consistently with the Equal Protection Clause.

*Mahan v Howell* holds that following county, township and city boundary lines is a valid justification for divergence from population equality.

Preservation of the integrity of "political subdivisions, insofar as possible" and the maintenance of "compact districts" were said, in *Reynolds v Sims* to be legitimate state goals.[15] While that

---

[15] "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for

statement was dictum, we conclude that, absent a different statement by the Court, achieving election districts which are as compact as possible is a legitimate state goal. Rectangularity, uniformity and squareness in shape express essentially the same concept and are thus also valid state goals.[16]

It is implicit in the decisions of the United States Supreme Court that a state may legitimately opt for contiguous rather than floterial districts.

## C

An apportioning authority is justified in adopting only that degree of divergence from population equality essential to achieve the state goals. Once achieved, the flexibility is at an end. Accordingly, divergence from the federal goal of population equality is permitted only to the extent necessary to permit achievement of the state goals of observing the boundary lines of local units of government and compactness.

The range of divergence necessary to achieve the state goals shall be determined (i) separately for the state as a whole when apportioning senators and representatives to the counties, (ii) for each county, separately, when apportioning senators and representatives within a county, and (iii) for each city and township entitled to more than one

---

*compact districts of contiguous territory* in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering. (Emphasis supplied.) *Reynolds v Sims, supra,* 578-579.

[16] This was the view of delegates to the Constitutional Convention. See 2 Official Record, Constitutional Convention 1961, pp 2111, 2112, 2151.

senator or representative, separately, when apportioning senators and representatives within a township or city.

We have considered the "range of allowable divergence" from the federal goal of population equality. Following the *Mahan* approval of a divergence of 16.4%, courts generally have concluded that 16.4% is the range of allowable divergence.[17]

[17] In *Mahan v Howell, supra,* 338, the United States Supreme Court held that a 16.4% maximum deviation from exact population equality was justified because it was the result of " 'legitimate considerations incident to the effectuation of a rational state policy'. *Reynolds v Sims".* The Court in *Mahan* said, "While this percentage may well approach tolerable limits, we do not believe it exceeds them." 410 US 329. The Supreme Court had previously invalidated a plan with a 26.48% deviation, regarding such a deviation to be intolerable. *Kilgarlin v Hill,* 386 US 120; 87 S Ct 820; 17 L Ed 2d 771 (1967).

Although the Supreme Court did not hold in *Mahan* that 16.4% was the highest permissible deviation, state and lower federal courts have regarded that figure as the boundary. In *Sims v Amos,* 365 F Supp 215 (MD Ala, 1973), aff'd 415 US 902 (1974), the court rejected a plan with a 13.4% maximum deviation, because the population calculations were suspect and because the court did not believe the asserted interest in preserving *precinct* boundaries to be as significant a state interest as the preservation of *county* lines endorsed in *Mahan.* In dicta, the court construed *Mahan* to mean that no plan with a deviation greater than 16.4% could be justified. The California Supreme Court declared that "[a] maximum deviation greater than 16.4 percent is intolerable under the equal protection clause". *Assembly of State of California v Deukmejian,* 30 Cal 3d 638, 667; 180 Cal Rptr 297, 315; 639 P2d 939 (1982).

No court has approved a plan with deviations greater than 16.4%. In *Cosner v Dalton,* 522 F Supp 350 (ED Va, 1981), the court held intolerable a 22.13% deviation. See also *Schrage v State Board of Elections,* 88 Ill 2d 87; 430 NE2d 483 (1981) (apparently adopting 1% as its limit); *Clements v Valles,* 620 SW2d 112 (Tex, 1981) (regarding the 9.9% deviation in a Texas reapportionment plan approved in *White v Regester,* 412 US 755; 93 S Ct 2332; 37 L Ed 2d 314 [1973], as the limit).

In *Gaffney v Cummings, supra,* the Court held a 7.83% deviation was *de minimis,* and did not have to be justified by adherence to a rational state policy. In the companion case of *White v Regester, supra,* the Court held a 9.9% deviation to be *de minimis,* in part because the *average* deviation was small. In *Abate v Mundt,* 403 US 182; 91 S Ct 1904; 29 L Ed 2d 399 (1971), the Court had required a deviation of 11.9% to be justified.

Lower courts have come to regard a 10% deviation as *de minimis.*

## D

Analysis of the structure of art 4, §§ 2-6 and of the record of the Constitutional Convention indicates that there is a hierarchy of the criteria:

(a) All districts are required to be single-member districts and contiguous; no land may be detached or isolated from the rest of the district except where necessary because of a body of water.

(b) The organizing principle of the apportionment process, both for the Senate and House, was county lines.[18] Senators and representatives were

---

*Sims v Amos, supra* (dictum);  *Assembly of State of California v Deukmejian, supra.*

"[T]he fact that a 10% or 15% variation from the norm is approved in one state has little bearing on the validity of a similar variation in another state." *Swann v Adams,* 385 US 440, 445; 87 S Ct 569; 17 L Ed 2d 501 (1967).

[18] Michigan's adherence to the principle that county and township lines should be preserved in the creation of election districts dates back to the formation of the Northwest Territory on July 13, 1787, and has been voiced in every Michigan constitution adopted since that date.

The Northwest Ordinance of 1787, § 9, in setting up a unicameral legislature, provided:

"So soon as there shall be five thousand free male inhabitants of full age in the district, upon giving proof thereof to the governor, they shall receive authority, with time and place, to elect representatives from their *counties or townships,* to represent them in the general assembly".

This preference was also voiced in Michigan's first Constitution which set up a bicameral legislature. With respect to the House it was provided:

"The representatives shall be chosen annually on the first Monday of November, and on the following day, by the electors of the several counties or districts into which the State shall be divided for that purpose. *Each organized county shall be entitled to at least one representative; but no county hereafter organized shall be entitled to a separate representative until it shall have attained a population equal to the ratio of representation hereafter established."* Const 1835, art 4, § 4.

The provision respecting the Senate was even more explicit in its endorsement of the principle of county representation. It provided:

"The State shall be divided, at each new apportionment, into a number of not less than four nor more than eight senatorial districts, to be always composed of contiguous territory; so that each district shall elect an equal number of senators annually, as nearly as may be: *and no county shall be divided in the formation of such districts.*" Const 1835, art 4, § 6.

The Constitution of 1850 was similar to the first constitution in its treatment of Senate representation. It provided:

"The Senate shall consist of thirty-two members. Senators shall be elected for two years and by single districts. Such districts shall be numbered from one to thirty-two inclusive; each of which shall choose one senator. *No county shall be divided in the formation of senate districts, except such county shall be equitably entitled to two or more senators.*" Const 1850, art 4, § 2.

The House provision, however, not only retained its emphasis on county representation but emphasized for the first time the desirability of respecting the sovereign integrity of city and township boundaries:

"Each representative district shall contain, as nearly as may be, an equal number of inhabitants * * * and shall consist of convenient and contiguous territory. *But no township or city shall be divided in the formation of a representative district.* When any township or city shall contain a population which entitles it to more than one representative, then such township or city shall elect by general ticket, the number of representatives to which it is entitled. *Each county hereafter organized, with such territory as may be attached thereto, shall be entitled to a separate representative, when it has attained a population equal to a moiety of the ratio of representation.*" Const 1850, art 4, § 3.

Both the Constitution of 1908, which re-enacted the provisions of the 1850 Constitution, and the subsequent amendment of these reapportionment provisions by the people in 1952, reaffirmed Michigan's commitment to the preservation of counties, townships, and cities as the basic units of electoral representation in the Legislature. As of 1962, the 1908 Constitution as amended read in pertinent part as follows:

"The senate shall consist of 34 members. Senators shall be elected for 2 years and by single districts. Such districts shall be numbered from 1 to 34, inclusive, and *shall consist of the territory within the boundary lines of the counties existing at the time of the adoption of this amendment* * * *.*" Const 1908, art 5, § 2.

"The house of representatives shall consist of not more than 110 members. * * * *Each county, or group of counties forming a representative district, shall be entitled to a separate representative when it has attained a population equal to 50 per cent of the ratio of representation* * * *: Provided, That no township or city shall be divided in the formation of a representative district,* except that when a city is composed of territory in more than 1 county, it may be divided at the county line or lines". Const 1908, art 5, § 3.

to be apportioned only to counties with the result that county lines could never be broken.[19]

---

[19] See fn 3, *supra,* for the text of art 4, §§ 2 and 3.

The overarching priority that the delegates to the constitutional convention attached to the preservation of county units, while discernible upon an examination of the final product of their deliberations, is underscored by statements made on the floor of the convention.

This commitment was stated in the majority report of the Committee on Legislative Organization, the committee responsible for drafting the reapportionment provisions of the 1963 Constitution. In speaking about the Senate plan, the majority report said,

"The plan * * * bases representation 80 per cent on population and 20 per cent on area. This is achieved by calculating the percentage of the state's population living in each county, multiplying the number by 4, and adding the percentage of the total area in the county to that figure. The resulting figure is the county's apportionment factor, and *the county unit becomes the major building block in creating senate districts.*" 2 Official Record, Constitutional Convention 1961, p 2036.

Insofar as the House plan was concerned, the majority report said:

"All house districts will follow county boundary lines. This is recommended in order to assure citizens clearly identifiable and traditionally recognized voting districts, and to conform to the long established county organization patterns of many groups, including the political parties. Many states follow county lines in districting, and the weight of testimony heard by the committee overwhelmingly favored continuing this practice in Michigan." 2 Official Record, p 2036.

The paramount importance of the county line principle was also discussed at length by delegate Dehnke, himself a member of the Committee on Legislative Organization, when he took the floor to defend the majority report.

"Now it has been recognized—it became clear early in our proceedings before the committee—that the delegates from both sides were agreed that it would not be advisable to permit the cutting of counties in forming legislative districts in either house. Practical considerations convinced both groups that this would not be advisable and should not be done if it could possibly be avoided. Counties, of course, are not sovereign entities. I don't know of anyone who claimed that they were. But, historically, our counties have been formed for the convenience of the state, to facilitate the administration of government. They may be said to be the agents of the state, as a convenient unit for the administration of state laws and the maintenance of law and order; for judicial administration, for welfare administration, for keeping records of deeds, probates and so on. * * * Nothing is more proved, however, than that the integrity of the counties was considered of more importance than the equality of population." 2 Official Record, p 2099.

When comments such as these are taken into account, there can be

(c) In counties entitled to more than one senator or representative, the same principle that was adopted by the people for the allocation of senators and representatives among the counties was adopted for the allocation of senators and representatives within a county. It is stated first that the districts shall follow city or township boundary lines "to the extent possible" (for the Senate) and "where applicable" (for the House); and second, that senatorial districts shall be compact, contiguous and as nearly "uniform" in shape as possible and that representative districts shall be compact and contiguous and as nearly "square" in shape as possible.

little room to doubt that the integrity of county lines was a principle of prime importance to the framers of the 1963 Constitution.

The primacy under the 1963 Constitution of the county-line requirement is such that it takes precedence over the other criteria of preserving city and township lines (in those few instances where they cross county lines), compactness, uniformity and squareness.

Counties entitled to less than one senator or representative are required to be combined into election districts in accordance with the only criteria stated in §§ 2 and 3 for the organization of the less populous counties: (i) as to the Senate, compactness, convenience, contiguity, rectangularity and preservation of existing senatorial districts; and (ii) as to the House, compactness, convenience, and contiguity.

In the organization of these less populous counties, the first and controlling criterion is, again, that no county line shall be broken unless required in order to comply with the federal constitutional limitation regarding the range of allowable divergence. If without violating that limitation it were possible to organize the counties in more than one way, the controlling criteria, in order of importance, would be (i) observance of existing senatorial districts at the time of apportionment (it appears that preservation of existing senatorial districts was regarded as having a higher priority than compactness, see the comments of Professor James K. Pollock, a delegate to the Constitutional Convention, 2 Official Record, pp 2092-2093), and (ii). rectangularity:

(i) It may not be possible to observe existing senatorial districts because the invalidation of the weighted land area/population formulae may have so reduced the number of seats allocated to the less populous areas that this criterion cannot be implemented.

(ii) The terms, compactness, convenience, contiguity and rectangularity, appear to be complementary, expressive of the same concept. See fn 16.

While it is stated that the population of the districts shall be as nearly equal as possible within a 75%-125% range of divergence, that range was adopted so as to provide sufficient leeway to permit the organization of all election districts along city and township boundary lines, thereby indicating that the goal of following city and township boundary lines takes priority over the goal of population equality.[20]

The criteria that city and township boundary lines be followed and that the districts be compact, uniform and square do not conflict. They are rather complementary, and reflect essentially the same concept. Cities are, in general, made up of all or parts of townships which are generally perfect squares. Many cities thus have a certain compactness and uniformity or squareness because they follow former township lines.[21] We are persuaded that following city and township lines takes prece-

[20] This rationale was stated by delegate W. F. Hanna, a member of the Committee on Legislative Organization, on the convention floor:

"[I]n our committee, those of us who worked diligently on attempting to draw maps, being as fair as we know how in counties like Wayne, Oakland, Muskegon, or any of them, whether you apply it to the senatorial districts or the house, if you wish to stay within city-township boundaries, we found that the 75-125 was a practical limitation, and this was substantiated by the testimony of election officials and other research. Now I submit to you that once you get them as nearly equal as possible you then only have to put a floor or a bottom before you start breaking city or township lines." 2 Official Record, Constitutional Convention 1961, p 2115.

The provisions of the 1963 Constitution requiring that election districts be organized along county, city and township lines to the extent possible (i) enable voters living in a particular community to combine their votes more effectively to elect a representative from that area, (ii) facilitate the conduct of the election by reducing the number of precincts and special ballots, (iii) tend to preserve existing political party organizations, and (iv) limit the potential for gerrymandering.

[21] Noteworthy is that the requirement that city and township lines be followed is not qualified by "to the extent possible" in the rules for districting the House. The framers did not intend to provide a different guide for districting the House than the Senate. The "to the

dence over compactness in the districting of counties entitled to more than one senator or representative.[22]

(d) The only criteria stated for cities and townships entitled to more than one legislator are population equality, as nearly as possible within a range of 75%-125% of the ideal, and compactness (uniformity or squareness) to "the extent possible".

The goals of population equality and compactness may be readily harmonized. The range of 75%-125% was selected to facilitate drawing election district lines on city and township lines, not to facilitate greater compactness.

The goal of compactness seeks to avoid gerrymandering and is not an end in itself. Districting solely to achieve population equality "may be little more than an open invitation to partisan gerrymandering". *Reynolds v Sims, supra,* 377 US 578. It is therefore necessary to limit the pursuit of the goal of equality of population to achieve the goal of compactness.

(e) An election district, circumscribed by a circle,

extent possible" was added for the more populous senate districts because it was less likely that this goal could be fully realized in districting the Senate. We read the omission of "to the extent possible" in House districting as indicative that a high degree of adherence to township and city lines was contemplated.

[22] We so conclude based on the language and structure of art 4, §§ 2 and 3, which first state the criterion of following city and township lines (and only qualify that criterion for the more populous senate districts with the words "to the extent possible"), and because that is what one of the members of the committee who drafted the language ultimately adopted said was meant:

"*Mr. Yeager:* * * * The language of the proposal specifically states that the first consideration will be given to county and township lines. The second consideration is square in shape; not perfectly square, but square in shape." 2 Official Record, Constitutional Convention 1961, p 2150.

containing the least land area (excluding land outside of this state or under the Great Lakes) outside of the district, is the most compact.

## IV

At the outset of this opinion, we said that the questions of standards and severability are interrelated. Until we could describe the commission's function after *Reynolds v Sims,* we could not decide whether the changes wrought by the United States Supreme Court have so changed the commission that it can no longer properly exercise the power delegated to it.

Having delineated the standards that govern, it is now necessary to stand back and look at the commission and ask ourselves whether this is the apportionment schema the people voted for?

## A

A commission guided by standards clearly delineated in advance and which are enforced is a different body than a commission left to its own devices restrained only by federal constitutional requirements.

While the commission could be made to work and the Legislature could, in the application of those rules, be redistricted and reapportioned, those rules necessarily operate differently than they would have if the weighted land area/population formulae were valid.

Persons living in less populous areas, who had a protected position under those formulae which assured a particular number of seats and an en-

larged voice in the Legislature, no longer have that advantage. To be sure they were denied that advantage by the *Reynolds* decision, but *Reynolds* does not require that the remaining apportionment rules be applied without a return to the political process for a decision on how the Legislature shall be apportioned.

The parties have cited case law concerning the severability of statutes, but art 4, §§ 2-6 is not a statute. This Court will not apply case law developed in the resolution of controversies concerning statutory invalidity where the issue presented concerns constitutional invalidity.

Nor is this a case of a single line item of the constitution being held violative of the federal constitution, for example, a provision of the finance article or one of the innumerable specific delegations of executive, legislative or judicial power.

The invalidity here declared goes to the heart of the political process in a constitutional democracy.

Constitutional democracies historically have not always been organized with separate but equal executive and judicial branches. A constitutional democracy cannot exist, however, without a legislature that represents the people, freely and popularly elected in accordance with a process upon which they have agreed.

The issue here is power—political power—in a constitutional democracy. The Legislature has the ultimate authority to make the laws by which the people are governed. Any change in the means by

which the members of the Legislature are chosen is a fundamental matter.

The United States Supreme Court has declared that some aspects of the method chosen by the people of Michigan are violative of the federal constitution. That Court having so declared, the question before us is what is the responsibility of this Court.

No one can say whether the 1963 Constitution would have been adopted without an apportionment commission and the apportionment rules of art 4, §§ 2-6. Nor can anyone say whether the 1963 Constitution would have been adopted with the apportionment rules which result by reason of the partial invalidity under the federal constitution of the rules adopted.

Nor can anyone predict what the voters would do if presented with the severability question at a general election. Some voters might view with favor an apportionment commission that is governed by neutral principles, known in advance, and which redistricts and reapportions the state in a largely mechanical manner with little opportunity for partisan maneuvering. In many states, the most egregious gerrymandering is practiced by the Legislature with the aid of computers to achieve results which will pass muster under federal standards yet favor the partisan interests of the dominant political faction.

The people may prefer to have the matter returned to the political process or they may prefer plans drawn pursuant to the guidelines which are delineated in this opinion.

It is not for this Court to speculate on a matter of such enormous importance. This is a decision which the people should make.

This Court's decisions in 1964 and 1972, reapportioning the Legislature by choosing a plan submitted by partisan interests, have lent some legitimacy to an apportionment system of which the people have not wholly approved. If this Court does not invalidate the apportionment provisions of art 4, §§ 2-6, in their entirety,[23] many people may conclude that this Court, in simply making do with a doubtful situation, has lent its imprimatur to the bandaged formulae and that the burden is on those who would seek to have it changed.

The formulae which this Court has twice implemented are not what the people approved. What they approved they cannot have. And what they have, we cannot approve.

The matter should be returned to the political process in a manner which highlights rather than hides the choices the people should make.

We have accordingly concluded that the apportionment provisions of art 4, §§ 2-6, cannot be maintained. When the weighted land area/population apportionment formulae fell, all the apportionment rules fell because they are inextricably related.

The commission cannot survive without apportionment rules. Article 4 provides only for apportionment according to rules stated in the Michigan Constitution. This Court, under article 4, can only

---

[23] The provisions establishing number of senators and representatives, terms of office, and time of elections are not apportionment provisions and are severable.

order the commission to comply with Michigan constitutional standards. It has no basis for choosing between alternative plans without Michigan constitutional criteria. The notion that the people of this state confided to an apportionment commission without apportionment rules absolute discretion to reapportion the Legislature and thereby reallocate political power in this state limited only by human ingenuity and by no federal constitutional standard that a computer cannot circumvent is unthinkable.

We conclude that the apportionment rules are not severable and that the commission therefore also is not severable.[24]

## B

The power to redistrict and reapportion the

[24] A majority of the Court has rejected the contrary view that:

(a) The "constitutional requirements" concerning county, city and township lines, which preserve the autonomy of local government subdivisions, and compactness, designed to prevent gerrymandering, were not part of the political compromise reflected in the weighted land area/population formulae. They are separate requirements which carry forward provisions and concepts which extend back over 100 years from the Constitution of 1850 through the Constitution of 1908 and the 1952 amendment thereto. The invalidity of the weighted land area/population formulae under the United States Constitution does not affect the continuing viability of those separate requirements and they are accordingly severable.

(b) The severable constitutional requirements guide the commission in the performance of its duties and this Court in determining which plan most accurately, or whether a finally adopted plan, complies with the constitutional requirements. Neither elimination of land area as a factor in apportioning senators and representatives among the counties nor the application of the range of allowable divergence as a limitation in drawing election districts along county, city and township lines changes the commission's function or enlarges its discretion, nor does it affect this Court's function in deciding which plan most accurately, or whether a finally adopted plan, complies with the constitutional requirements. The provisions regarding the commission are accordingly severable and survive the invalidity of the weighted land area/population formulae.

Legislature remains with the people. The people, however, can only exercise that power, as a practical matter, by amending the constitution, which, unless the Legislature proposes an amendment acceptable to the people, is a difficult and time-consuming process.[25] In the meantime, there must be a Legislature and federal constitutional requirements must be observed.

It is this Court's responsibility in deciding the severability question to consider and choose among the alternatives for the continuing governance of this state.

We recognize that the people cannot immediately indicate their preference. This Court must provide for the redistricting and apportionment of the Legislature in compliance with federal constitutional requirements and in a manner most consistent with the constitutional history of this state. The redistricting and apportionment plan resulting from this Court's determination will stand until the people act, or it is changed by the collective action of the other two branches of this government, composed of persons who are the most immediate representatives of the people.

C

Apart from population and land area, we see in the constitutional history of this state dominant commitments to contiguous, single-member districts drawn along the boundary lines of local units of government which, within those limitations, are as compact as feasible.

We accordingly direct that election districts

---

[25] The initiative process is also difficult and time-consuming.

shall be drawn in accordance with the following criteria:

(a) Senate and House election district lines shall preserve county lines with the least cost to the federal principle of equality of population between election districts consistent with the maximum preservation of county lines and without exceeding the range of allowable divergence under the federal constitution which, until the United States Supreme Court declares otherwise, shall be deemed to be 16.4% (91.8%-108.2%).[26]

Where it is necessary to break county lines, because otherwise the range of allowable divergence would be exceeded, there shall be shifted the fewest cities or townships necessary to reduce the population divergence sufficiently to bring it within the range of allowable divergence.

Because of the narrowness of the range of allowable divergence, we anticipate that only one plan will organize the counties with the least breaking of county lines.

(b) After the county lines are drawn, the election district lines within those counties to which there is apportioned more than one senator or representative shall be drawn on city and township lines with the least cost to the federal principle of equality of population between election districts consistent with the maximum preservation of city

---

[26] We do not read the decisions of the United States Supreme Court as imposing an absolute standard. Its opinions indicate rather that no hard and fast rule was laid down:

"[T]he fact that a 10% or 15% variation from the norm is approved in one State has little bearing on the validity of a similar variation in another State." *Swann v Adams,* 385 US 440, 445 (1967).

and township lines and without exceeding the range of allowable divergence.

Where it is necessary to break city or township lines, because otherwise the range of allowable divergence would be exceeded, there shall be shifted the number of people necessary to achieve population equality between the two election districts affected by the shift.

(c) Within a city or township to which there is apportioned more than one senator or representative, election district lines shall be drawn to achieve the maximum compactness possible within a population range of 98%-102% of absolute equality between districts within that city or township.[27]

### D

The Court appoints Bernard J. Apol, former director of elections, to supervise the drawing and submission to this Court for approval of a redistricting and apportionment plan in accordance with C above, with the assistance of the professional staff and facilities of the Secretary of State's office. Upon receipt of the plan, the Court will hold a public hearing before ordering it to be adopted.

### E

The Legislature may, by a statute approved by the Governor with immediate effect at least four weeks preceding the filing date for nominating petitions for the August 1982 primary, redistrict and reapportion the Legislature in a manner consistent with federal and state constitutional re-

___

[27] We have considered the plans filed March 22, 1982, by members of the commission. The commission is no longer viable.

quirements. Such a statutory redistricting and reapportionment plan shall supersede the plan directed to be drawn in accordance with C above.

Coleman, C.J., and Kavanagh, Williams, Levin, Fitzgerald, Ryan, and Blair Moody, Jr., JJ., concurred.

## Order

Entered March 25, 1982.—Reporter.

This matter having come to this Court, as provided in the 1963 Constitution, art 4, § 6, by advice from the secretary of the Commission on Legislative Apportionment that the commission could not agree upon a plan for districting and apportioning the Michigan Legislature and by the filing of such proposed plans by members of the commission, and argument having been heard on the issue of the constitutionality of Const 1963, art 4, §§ 2-6, it is hereby adjudged that the districting and apportionment provisions of art 4, §§ 2-6 are unconstitutional and that the 38 senators and 110 representatives provided for in art 4, §§ 2 and 3 respectively, shall be elected from contiguous single-member districts pursuant to districting and apportionment plans drawn as follows.

Bernard J. Apol, former Director of Elections, is appointed to supervise the drawing and submission to this Court for approval of a legislative redistricting and apportionment plan in accordance with the instructions set forth in the Court's opinion in this matter. The Secretary of State shall provide all necessary technical services and facilities to accomplish this purpose.

Bernard J. Apol is instructed to communicate

any questions concerning application of the criteria for redistricting and apportionment, set forth in the Court's opinion in this matter, to the clerk of this Court. The Court will resolve such questions promptly, and if their resolution requires addition, amendment or modification of the criteria contained in this Court's opinion in this matter, such addition, amendment or modification will be announced by the issuance of a Court order.

Forthwith upon submission of the plan for this Court's approval the Secretary of State shall treat the plan as any ordinary public record and make its contents accessible to all persons who may be interested. To promote the prompt and orderly completion of the plan, until it is completed and so submitted all persons assisting in its completion shall release information concerning it only to this Court or its clerk.

The Legislature may, by a statute which has immediate effect and is approved by the Governor on or before May 4, 1982, in order to preserve the established election schedule for this year, redistrict and reapportion the Legislature in a manner consistent with federal and state constitutional requirements. If such legislation is enacted, the Court will review it *sua sponte* forthwith and promptly announce, by order, whether it is consistent with federal and state constitutional requirements. If such legislation is found to be so consistent it will govern the legislative elections due this year and subsequently in accordance with the order to be issued by this Court. If no such legislation is enacted, the plan for legislative redistricting and apportionment drawn pursuant to this Court's order will govern the elections to be held this year. Before ordering into effect the plan

drawn pursuant to this Court's order a public hearing will be held.

## ORDER

Entered April 30, 1982.—REPORTER.

On order of the Court, a motion for rehearing is considered and, prior to decision on the motion, the Court will hear oral argument by the parties on the matter at 11 a.m. on Wednesday, May 5, 1982.

## ORDER

Entered April 30, 1982.—REPORTER.

Redistricting and apportionment plans for both the Michigan Senate and House of Representatives having been submitted to this Court for approval by the Court's appointee, Bernard J. Apol, pursuant to this Court's opinion in this matter issued March 25, 1982, it is hereby ordered, also pursuant to provision in the said opinion, that a public hearing shall be held in the Supreme Court hearing room, Lansing, Michigan, commencing at 1 p.m. on Wednesday, May 5, 1982.

This hearing is limited to the question: "Do the plans which have been submitted to the Court for approval by Bernard J. Apol adhere to the rules and standards set forth in the Court's opinion?"

All persons interested in addressing the Court on the question may address a written request for that purpose to the clerk of this Court. If it is not otherwise possible to accommodate all such requests, preference will be given to those who have given some indication in their requests of what the

content of their presentation would be. It is suggested that all such requests contain a telephone number at which the clerk may contact a requestor and confirm whether that request for participation can be accommodated.

## ORDER

Entered May 13, 1982.—REPORTER.

In this matter, the Court's opinion was issued and the judgment order thereon entered on March 25, 1982. The Court's judgment order provided, *inter alia,* that the Legislature could, by a statute with immediate effect which was approved by the Governor on or before May 4, 1982, redistrict and reapportion the Legislature in a manner consistent with federal and state constitutional requirements. No statute was enacted.

Now therefore, plans for the redistricting and reapportionment of the Michigan Legislature, drawn under the supervision of Bernard J. Apol, former Director of Elections, having been submitted to the Court for approval on April 27, 1982, for the Senate and on April 29, 1982, for the House of Representatives, and a public hearing, open to all interested persons, having been held on May 5, 1982, on the question of whether said plans adhered to the rules and standards set forth in this Court's opinion, all as provided for in this Court's judgment order, this Court directed Bernard J. Apol to reconsider the plans submitted by him on April 27 and 29, particularly in light of the comments made at the public hearing on May 5, 1982, and the written materials submitted in lieu of or in support of oral presentations, and upon such reconsideration to recommend to the Court any

and all modifications to the plans submitted by him on April 27 and 29, which he considered would make the said plans more compliant with the rules and standards set forth in the Court's opinion.

Several modifications having been recommended by Bernard J. Apol and considered by the Court, he was directed to prepare them in proper form for inclusion by substitution in the plans submitted for approval on April 27 and 29. Having received those modifications in appropriate form on May 12, 1982, it is hereby further ordered (1) that the clerk of this Court shall treat those modifications as any ordinary public record, and make their contents accessible to any and all interested persons; (2) that any and all interested persons may file with the clerk, until 12 noon on May 19, 1982, written arguments (a signed original and 8 copies) attempting to show that the modifications should not be accepted on the ground that they do not cause the plans submitted on April 27 and 29 to be more compliant with the rules and standards set forth in this Court's opinion.

After considering all written submissions filed with the clerk pursuant to this order, and in all events by 12 noon on May 21, 1982, this Court will cause to be delivered to the office of the Secretary of State an order directing that he publish as provided by law, and hold the legislative elections for this year in accordance with, the plans submitted to this Court by Bernard J. Apol on April 27 and 29, 1982, as amended by the modifications thereto submitted to this Court by him on May 12, 1982. If the Court is persuaded by submissions filed pursuant to this order that any of the modifications submitted to this Court by Bernard J. Apol

on May 12, 1982, should not be implemented, the
order to be issued by 12 noon on May 21, 1982,
will so indicate.

It is further ordered: that the date for the filing
of nominating petitions or payment of filing fees
for the office of state senator and state representa-
tive, and for the filing of nominating petitions for
the office of representative in congress, and for
these offices only, shall be extended until June 15,
1982, at 4 p.m.;

That the Court of Appeals may, in such cases as
it deems appropriate, extend the date for the filing
of nominating petitions or payment of filing fees
for the office of county commissioner until June
15, 1982, at 4 p.m.;

That the date for the filing of nominating peti-
tions for the office of delegate to the county con-
vention shall be extended until June 8, 1982, at 4
p.m.;

That the date for the withdrawal of a candidate
who has filed nominating petitions or paid filing
fees for an office to be nominated at the 1982
primary election shall be extended until June 18,
1982, at 4 p.m.;

That the primary election for the year 1982 only
shall be held on August 10, 1982; that any refer-
ence to the date of the primary election in nomi-
nating petitions heretofore or hereafter filed or
circulated or in affidavits of identity or affidavits of
candidacy heretofore or hereafter filed shall be
construed to mean the primary election to be held
August 10, 1982;

That the Secretary of State may authorize, upon

written request by a city or township election commission, a division of a precinct which contains portions of more than one elective district for an office appearing on the ballot until May 28, 1982; that the chairman of a county political committee who has previously apportioned the number of delegates to the county convention for precincts as they existed on May 5, 1982, may make such changes as are necessary by the division of precincts authorized in this order using the same formula that was used in the original apportionment, and that all changes shall be delivered to the county election commission by 4 p.m. on June 1, 1982;

That any person who has heretofore filed petitions containing the required number of signatures for election as delegate to the county convention from a precinct, and that precinct has been changed pursuant to this order shall be placed on the ballot as a candidate for precinct delegate to the county convention from the precinct in which he resides.

We retain jurisdiction.

BLAIR MOODY, JR., J., dissents and will supply a statement with the final order of the Court. (See *post,* p 214.)

## · ORDER

Entered May 21, 1982.—REPORTER.

On order of the Court, motions by the Democratic members of the Commission on Legislative Apportionment for immediate consideration and for permission to submit their motion for rehearing in typewritten form are considered, and are hereby granted. The motion for rehearing filed by

the Democratic members of the Commission on Legislative Apportionment is considered and is hereby denied. The motion by William Faust to intervene as to remedy, if the motion for rehearing were granted, becomes moot thereby and is denied.

Justices LEVIN and FITZGERALD fully concur and say:

On March 25, 1982, this Court held that the weighted land area/population formulae, invalidated by *Reynolds v Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964), and the remaining apportionment rules of Const 1963, art 4, §§ 2-6 were interdependent and not severable, and that the provisions establishing an apportionment commission and concerning its function and review by this Court were also not severable, and that, accordingly, the apportionment rules and the provisions respecting the apportionment commission cannot be maintained. *Ante,* pp 115, 138.

I

The opinion of the Court directed the drawing of election districts in a manner compliant with federal constitutional requirements consistent with the constitutional history of this state, and that the resulting redistricting and apportionment plan would stand until the Legislature and the Governor or the people provided by law an alternative plan. *Ante,* pp 116, 142.

On March 25, this Court entered a judgment order which, pursuant to the opinion, declared that the districting and apportionment provisions of Const 1963, art 4, §§ 2-6 had been adjudged to be unconstitutional, and that 38 senators and 110

representatives, provided for in art 4, §§ 2-3, shall be elected from contiguous, single-member districts pursuant to districting and apportionment plans drawn as provided for in the opinion of the Court and that order.[1]

The opinion and order appointed Bernard J. Apol to supervise the drawing and submission to this Court for approval of a legislative redistricting and apportionment plan in accordance with the instructions set forth in the Court's opinion.

The opinion directed that the election districts be drawn in accordance with the following criteria:

"(a) Senate and house election district lines shall preserve county lines with the least cost to the federal principle of equality of population between election districts consistent with the maximum preservation of county lines and without exceeding the range of allowable divergence under the federal constitution which, until the United States Supreme Court declares otherwise, shall be deemed to be 16.4% (91.8%-108.2%).

"Where it is necessary to break county lines, because otherwise the range of allowable divergence would be exceeded, there shall be shifted the fewest cities or[2] townships necessary to reduce the population divergence sufficiently to bring it within the range of allowable divergence.

"Because of the narrowness of the range of allowable divergence, we anticipate that only one plan will organize the counties with the least breaking of county lines.

"(b) After the county lines are drawn, the election district lines within those counties to which there is

---

[1] *Ante,* p 143.

[2] The words "cities or" were not in the opinion as originally filed; this and other oversights were discovered within a few days of the filing of the opinion on March 25 and the Court directed the Reporter of Decisions to add those words and to make other corrections in the opinion.

apportioned more than one senator or representative shall be drawn on city and township lines with the least cost to the federal principle of equality of population between election districts consistent with the maximum preservation of city and township lines and without exceeding the range of allowable divergence.

"Where it is necessary to break city or township lines, because otherwise the range of allowable divergence would be exceeded, there shall be shifted the number of people necessary to achieve population equality between the two election districts affected by the shift.

"(c) Within a city or township to which there is apportioned more than one senator or representative, election district lines shall be drawn to achieve the maximum compactness possible within a population range of 98%-102% of absolute equality between districts within that city or township."[3]

The order provided that Mr. Apol shall communicate "any questions concerning application of the criteria for redistricting and apportionment, set forth in the Court's opinion in this matter, to the clerk of this Court. The Court will resolve such questions promptly, and if their resolution requires addition, amendment or modification of the criteria contained in this Court's opinion in this matter, such addition, amendment or modification will be announced by the issuance of a Court order."[4]

The opinion also provided that the "Legislature may, by a statute approved by the Governor with immediate effect at least four weeks preceding the filing date for nominating petitions for the August 1982 primary, redistrict and reapportion the Legislature in a manner consistent with federal and state constitutional requirements. Such a statutory

[3] Ante, p 141.

[4] Ante, p 143.

redistricting and reapportionment plan shall supersede the plan directed to be drawn in accordance with" the criteria (a)-(c) set forth in the opinion of the Court quoted above.[5]

The order elaborated on the opinion and stated:

"The Legislature may, by a statute which has immediate effect and is approved by the Governor on or before May 4, 1982, in order to preserve the established election schedule for this year, redistrict and reapportion the Legislature in a manner consistent with federal and state constitutional requirements. If such legislation is enacted the Court will review it *sua sponte* forthwith and promptly announce, by order, whether it is consistent with federal and state constitutional requirements. If such legislation is found to be so consistent it will govern the legislative elections due this year and subsequently in accordance with the order to be issued by this Court. If no such legislation is enacted, the plan for legislative redistricting and apportionment drawn pursuant to this Court's order will govern the elections to be held this year. Before ordering into effect the plan drawn pursuant to this Court's order a public hearing will be held."[6]

## A

On April 14, 1982, the Democratic members of the apportionment commission filed a motion for rehearing, stating that this Court had found the apportionment provisions of Michigan's 1963 Constitution to be unconstitutional "and then reimposed much the same provisions on its own agent Bernard Apol", and that the Court had done so "(1) without affording the parties due process of input on what remedial standards, if any, would apply if the state constitutional provisions were stricken; (2) based on a misconception of Michigan

[5] *Ante,* p 142.
[6] *Ante,* p 144.

'constitutional history'; and (3) in violation of *post-Mahan v Howell* United States Supreme Court authority, which rejected for *court-ordered legislative reapportionment plans* such mechanistic applications of *Mahan."* (Emphasis in original.)

On May 5, 1982, the Republican members of the apportionment commission filed a written response to the motion for rehearing stating that due process and an opportunity to be heard had been provided, that the criteria set forth in the opinion of the Court do conform to the constitutional history of this state, and that the Court's decision is not violative of post-*Mahan* decisions of the United States Supreme Court.

B

Pursuant to the opinion of the Court, Mr. Apol communicated to the Court questions concerning the application of the criteria for redistricting and apportionment. The clerk of the Court communicated with Mr. Apol; Mr. Apol met with the Court in conference and submitted progress reports.

The Court responded to Mr. Apol's inquiries, reiterating criteria set forth in the opinion and expanding on such criteria as follows:

1. The Senate consists of 38 districts.

2. The House consists of 110 districts.

3. All districts shall be contiguous, single-member districts.

4. The districts shall have a population not exceeding 108.2% and not less than 91.8% of the ideal district which, based on the 1980 census, would contain 243,739 persons in the Senate and 84,201 persons in the House.

5. The boundaries of the districts shall first be drawn to contain only whole counties to the extent this can be done within the 16.4% range of diver-

gence and to minimize within that range the number of county lines which are broken.[7]

6. If a county line is broken, the fewest cities or townships necessary to reduce the divergence to within 16.4% shall be shifted; between two cities or townships, both of which will bring the district within the range, the city or township with the least population shall be shifted.[8]

7. Between two plans with the same number of county line breaks, the one that shifts the fewest cities and townships statewide shall be selected; if more than one plan shifts the same number of cities and townships statewide, the plan that shifts the fewest people in the aggregate statewide to election districts that break county lines shall be selected.

8. In a county which has more than one senator or representative, the boundaries of the districts shall first be drawn to contain only whole cities and townships to the extent this can be done within the 16.4% range of divergence and to mini-

---

[7] There is a subsidiary rule that if one part of a county is shifted to one district and all the rest of the county is shifted to another district that counts as one break.

[8] Where county lines must be broken, whole cities or townships must be shifted in order to avoid breaking city and township lines.

The Court considered whether, when cities or townships must be shifted, there should be shifted (i) the number of cities or townships necessary to equalize the population of the two districts, or (ii) only the number of cities or townships necessary to bring the districts within the range of allowable divergence. The Court concluded that the concept of minimizing the breaking of county lines extended to the shifting of cities and townships. A county is kept more intact as a community of interest, and fewer special election districts must be created, when the minimum necessary number of cities or townships are shifted.

There remained the possibility that two sets of cities or townships might satisfy the above rule; for example, each of two townships might contain the population required to be shifted. The Court again concluded that the concept of preserving counties as communities of interest to the fullest extent possible required that the township or set of townships with the fewest people necessary should be shifted.

mize within that range the number of city and township lines which are broken.

9. If a city or township line is broken, there shall be shifted the number of people necessary to achieve population equality between the two election districts affected by the shift,[9] except that in lieu of absolute equality the lines may be drawn along the closest street or comparable boundary; between alternative plans, shifting the necessary number of people, the plan which is more compact is to be selected.

10. Between two plans, both of which have the same number of city and township breaks within a particular county, the one which minimizes the population divergence in districts across the county is to be selected.

11. Within a city or township which is apportioned more than one senator or representative, election district lines shall be drawn to achieve the maximum compactness possible within a population range of 98%-102% of absolute equality between districts within that city or township.

12. Compactness shall be determined by circumscribing each district within a circle of minimum radius and measuring the area, not part of the Great Lakes and not part of another state, inside the circle but not inside the district. The plan to be selected is the plan with the least area within all the circles not within the district circumscribed by the circle.

## C

On April 29, 1982, the Court received a House plan from Mr. Apol; it had received a Senate plan

---

[9] This rule is somewhat inconsistent with the rule applied to county line breaks. That inconsistency simply reflects one of the compromises inherent in a unanimous opinion.

on April 27. Both plans, and Mr. Apol's covering memoranda of April 27 and April 29, were released to the public on April 29.

On April 30, the Court entered two separate orders directing that hearings be held on May 5, 1982:

—a hearing in the morning on the subject matter of the motion for rehearing which had been filed by the Democratic members of the apportionment commission,[10] and

—a public hearing in the afternoon on the question whether the plans submitted by Mr. Apol adhered to the rules and standards set forth in the Court's opinion.[11]

Bills had been introduced in the Legislature providing for redistricting and reapportionment, but the Legislature adjourned on May 4 without agreeing on a bill.[12]

At the May 5 hearing, on the motion for rehearing, counsel for the Democratic members of the Commission on Legislative Apportionment argued that the criteria set forth in the opinion of the Court for the redistricting and apportionment of Senate and House were erroneous.[13] Counsel for

[10] *Ante,* p 145.

[11] *Ante,* p 145.

[12] A bill had passed the House on May 4 providing for the redistricting and reapportionment of the House which had been transmitted to the Senate. This bill did not contain provisions concerning the redistricting and reapportionment of the Senate. Later in the day, the Senate added senatorial redistricting and apportionment provisions. The bill was returned to the House on May 5. No further action was taken on the bill, and no bill was submitted to the Governor.

Neither the House nor the Senate plan was passed with a majority sufficient for immediate effect (Const 1963, art 4, § 27).

[13] The motion for rehearing sought, among other relief, to have the Court "vacate its decision". At the hearing, the lawyer for the Democratic members said that his objections went to the criteria and that he was not asking the Court to reconsider its decision holding that the apportionment provisions and the provisions concerning the apportionment commission could no longer be maintained.

the Republican members argued that the criteria were valid.

At the afternoon public hearing on May 5, the following persons appeared: Speaker Bobby Crim;[14] Jerold E. Lax, a lawyer representing the majority caucus of the Senate;[15] Senator William Faust, senate majority leader;[16] Senator Basil W. Brown;[17] A. Robert Kleiner, a Democratic member of the Commission on Legislative Apportionment;[18] Robert L. Henry, a lawyer representing the Republican members of the Commission on Legislative Apportionment;[19] Thomas F. Weider, who said he was representing himself;[20] Representative Ethel Terrell;[21] Senator Robert VanderLaan, senate mi-

[14] Speaker Crim urged the Court to adopt for the House of Representatives the redistricting and reapportionment plan which a majority of the House had adopted on May 4, 1982.

[15] Mr. Lax contended that the Apol plan does not comply with the criteria set forth in the opinion.

[16] Senator Faust said that the release of the Apol plan on April 29 made it impossible to reach a bipartisan agreement in the Senate because, compared to the 1972 apportionment plan pursuant to which the present members of the Senate had been elected, the Apol plan gave an advantage to the Republicans and there was, in consequence, insufficient incentive for Republican senators to negotiate with Democratic senators.

He urged the Court to find a method by which the matter could be returned to the Senate under circumstances "not having an advantage to one political party or any spelled out by this body to the people of the Senate. I think that in that give and take arena, in my judgment, if the Apol plan had not been made public we would have reached a bipartisan agreement. And we would have had today, a bill on the Governor's desk for signature."

[17] Senator Brown said that as a result of the Apol plan, 85%-90% of the Senate district in which he lives will be new territory, and urged the Court to provide additional time for the Legislature to agree on a plan.

[18] Mr. Kleiner contended that the Apol plan does not comply with the criteria of the opinion.

[19] Mr. Henry contended that the Apol plan does comply with the criteria of the opinion.

[20] Mr. Weider contended that the Apol plan does not comply with the criteria of the opinion.

[21] Representative Terrell urged the adoption of the Apol plan and expressed opposition to what she characterized as the House incum-

nority leader;[22] Representative William R. Bryant, Jr., house minority leader;[23] Representative James E. Defebaugh;[24] Representative Debbie Stabenow.[25]

The Court received written submissions from Speaker Crim, Senator Faust, Representative Stabenow, Mr. Kleiner, Mr. Weider, and a number of members of the Legislature who did not speak at the public hearing.

## D

The Court engaged Ketron, Inc., to prepare computer-based districting plans. The Court received from Ketron preliminary plans for the Senate and the House.

It appeared on comparison of the Apol and Ketron plans that the Apol plan was in some particulars more compliant with the criteria than

bents' plan—the plan which had passed the House on May 4—because that plan would divide the City of Highland Park, part of her district, into two districts.

[22] Senator VanderLaan said that the Senate and House had failed to adopt a plan, contended that the bills had not been voted upon in accordance with the requirements of Const 1963, art 4, § 26, and asserted that the plan offered by the senate majority was not a "bipartisan plan" and that it was unacceptable to the Republican minority. He expressed approval of the criteria set forth in the opinion of the Court, stating "that breaking as few county and municipal boundaries as possible is sound constitutional practice". He stated that the plans that had been offered in the House and Senate were incumbents' plans, that preservation of incumbency was not a proper concern and that he was "reasonably sure that the Senate will not reach a compromise on a Senate plan" and urged adoption of the Apol plan.

[23] Representative Bryant said that although he had voted on May 4 for the plan which had passed the House, his vote was on the understanding that House minority support was subject to there being a Senate plan acceptable to the Senate minority, and that not having been achieved the House plan was not acceptable to the House minority.

[24] Representative Defebaugh, a Republican member, said that he supports the criteria and the Apol plan.

[25] Representative Stabenow expressed support for the plan which had passed the House and opposition to the Apol plan because, in her view, it would affect adversely incumbent women representatives.

the Ketron plan, while the Ketron plan was more compliant in other particulars.

The Court resolved that the provisions and features which were most compliant with the criteria, whether set forth in the Apol or the Ketron plan, should be adopted.

The Apol and Ketron plans were prepared independently.[26] The Ketron plan was prepared mathematically by technicians located in another state who are unfamiliar with either the geography or the political history of this state and provides a measure of protection against the injection, however unintentionally, of subjective judgments by persons who have such knowledge. Having the plans prepared by two separate groups provides further assurance that the district lines will be more compliant with the criteria in light of the tight time span in which Mr. Apol and Ketron have been working.

Mr. Apol and Ketron have cautioned that plans complying more exactingly with the criteria no doubt could be prepared if more time were available.

E

On May 13, 1982, the Court promulgated a revised Apol plan and stated that after the May 5, 1982, hearing the Court had

"directed Bernard J. Apol to reconsider the plans submitted by him on April 27 and 29, particularly in light of the comments made at the public hearing on May 5, 1982, and the written materials submitted in lieu of or in support of oral presentations, and upon such reconsideration to recommend to the Court any and all

_____
[26] Ketron, Inc., was supplied with a preliminary Senate plan which had been prepared by Mr. Apol before the contract with Ketron was entered into.

modifications to the plans submitted by him on April 27 and 29, which he considered would make the said plans more compliant with the rules and standards set forth in the Court's opinion."

Mr. Apol incorporated into the revised plan modifications based on improvements which appeared upon examination of the Ketron plan, communications from Messrs. Kleiner and Weider and others, and improvements discovered on more complete examination by Mr. Apol and his staff. The May 13 order further stated:

"Several modifications having been recommended by Bernard J. Apol and considered by the Court, he was directed to prepare them in proper form for inclusion by substitution in the plans submitted for approval on April 27 and 29. Having received those modifications in appropriate form on May 12, 1982, it is hereby further ordered (1) that the clerk of this Court shall treat those modifications as any ordinary public record, and make their contents accessible to any and all interested persons; (2) that any and all interested persons may file with the clerk, until 12 noon on May 19, 1982, written arguments (a signed original and 8 copies) attempting to show that the modifications should not be accepted on the ground that they do not cause the plans submitted on April 27 and 29 to be more compliant with the rules and standards set forth in this Court's opinion."

The Court received on May 19 written communications from various persons which were considered by the Court in conference on May 20.

The May 13 order further provided:

"After considering all written submissions filed with the clerk pursuant to this order, and in all events by 12 noon on May 21, 1982, this Court will cause to be delivered to the office of the Secretary of State an order directing that he publish as provided by law, and hold

the legislative elections for this year in accordance with, the plans submitted to this Court by Bernard J. Apol on April 27 and 29, 1982, as amended by the modifications thereto submitted to this Court by him on May 12, 1982. If the Court is persuaded by submissions filed pursuant to this order that any of the modifications submitted to this Court by Bernard J. Apol on May 12, 1982, should not be implemented, the order to be issued by 12 noon on May 21, 1982, will so indicate.[27]

Pursuant to the foregoing paragraph of the May 13 order the Court has today entered an order directing the Secretary of State to publish and to hold the legislative elections for this year in accordance with the redistricting and reapportionment plans thereby approved and described in the next paragraph:

"The plans approved are:
"1. The plans submitted to this Court for approval by Bernard J. Apol; for the Senate under the date of April 27, 1982, and for the House of Representatives under date of April 29, 1982;
"2. Substituting for the provisions of parts of the said plans dated April 27 and 29, the superseding provisions of the modifications dated and submitted by Bernard J. Apol for Court approval on May 12, 1982."

Today's order continues:

"The Court retains jurisdiction for the purpose of taking such affirmative action as may be necessary to insure an orderly election in 1982 pursuant to a constitutionally valid plan."[28]

The May 13 order further provided for an extension until June 15 of the time for filing nominat-

---

[27] *Ante,* p 147.

[28] *Post,* p 213.

ing petitions or payment of filing fees for the offices of state senator, state representative and representative in Congress and changed the date of the primary election for the year 1982 only from August 3 to August 10, 1982.

## F

The populations of the counties are such that there cannot be less than three county line breaks in the Senate and eight in the House.

The revised Apol plan, released May 13, and today adopted, has the county, city and township line breaks set forth in Appendix A.

A list of the Senate and House election districts by population and the variances is set forth in Appendix B. In the Senate, the maximum deviation is in a district 8.13% overrepresented and in a district 8.11% underrepresented for a total maximum deviation of 16.24%. In the House, the maximum deviation is in a district 8.19% overrepresented and in a district 8.15% underrepresented for a total maximum deviation of 16.34%.

## II

The March 25, 1982, opinion of the Court declared that "[t]his Court must provide for the redistricting and apportionment of the Legislature in compliance with federal constitutional requirements and in a manner most consistent with the constitutional history of this state". The Court said that it saw "in the constitutional history of this state dominant commitments to contiguous, single-member districts drawn along the boundary lines of local units of government which, within those limitations, are as compact as feasible."[29]

---

[29] *Ante,* p 140.

In directing that election district lines be drawn to preserve county, city and township lines within a maximum 16.4% range of divergence, the Court relied on the decision of the United States Supreme Court in *Mahan v Howell,* 410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973), where that Court had upheld a state legislative apportionment plan which, with a maximum percentage deviation of 16.4%, had departed from the goal of population equality in order to achieve what the Court said was the rational, legitimate state goal of preserving the integrity of political subdivisions of the state.

The motion for rehearing filed by the Democratic members of the Commission on Legislative Apportionment asserts that this Court's reliance on *Mahan v Howell* is misplaced because in subsequent decisions, *Chapman v Meier,* 420 US 1; 95 S Ct 751; 42 L Ed 2d 766 (1975), and *Connor v Finch,* 431 US 407; 97 S Ct 1828; 52 L Ed 2d 465 (1977), the United States Supreme Court had limited *Mahan* to apportionment plans adopted by a state legislature and imposed higher and more restrictive standards for "court-ordered" plans. It is asserted that the Apol plan is a court-ordered plan subject to the *Chapman/Connor* rule.

The motion for rehearing was filed before the Apol plan was released on April 29. During the May 5 oral argument on the motion for rehearing, counsel for the Democratic members of the Commission on Legislative Apportionment argued that *Mahan* is also distinguishable on the ground that the *average* percentage deviation under the *Mahan* plan was $\pm3.89\%$ while the average percent-

age deviation under the Apol plan when so released was ±5.20%.[30]

Counsel could not have been expected to have presented, before the March 25 opinion was released, the arguments concerning the applicability of *Mahan* made in the motion for rehearing and at the oral argument. The arguments require, in our opinion, a response in opinion form.[31]

## III

It is contended that *Chapman* and *Connor* stand for the proposition that all "court-ordered" reapportionment plans are constitutionally suspect if they produce substantial deviations from population equality absent compelling justification. This reading focuses on the phrase "court-ordered" plan and goes on to assume that all plans drawn by criteria defined (ordered) by a "court" or by a person or body designated by a court automatically come within the *Chapman/Connor* rule.

Such an assumption fails to take into account the source of the "court-ordered" plan doctrine and the factual context of *Chapman* and *Connor.* When these factors are introduced into the analysis, it appears that *Chapman* and *Connor* do not hold that all plans ordered by a court, regardless

[30] No brief expanding on the motion for rehearing was filed after oral argument was ordered.

[31] The judgment of this Court is subject to review by the United States Supreme Court and may also be subject to collateral attack (28 USC 2284[a]) if an action can be maintained in the federal courts following an adjudication of federal constitutional issues in this Court. See fn 55. In all events, an explanation of the basis upon which this Court rejected and adjudicated adversely to the contentions of those who object to the Apol plan their federal constitutional claims should, in our opinion, accompany the Court's order denying the petition for rehearing and promulgating the Apol plan.

of source, must ordinarily approximate population equality, but rather stand for a narrower set of propositions.

The higher standards announced in *Chapman* and *Connor* apply to plans ordered by *federal* courts to remedy a failure of a state to reapportion in compliance with the requirements of the Fourteenth Amendment. The higher standards do not apply to a "state-ordered" plan promulgated by state authority pursuant to, or to bring about compliance with, state law. The rule of *Mahan* applies unmodified by *Chapman* or *Connor* to an apportionment plan ordered by a state court to effectuate compliance with state law as well as to a plan adopted by a state legislature or by a state apportionment board or commission.

A

When a federal court apportions a state legislature, there is a risk that legitimate state policies will be ignored or misunderstood. To limit encroachment by the federal judiciary on state sovereignty, the United States Supreme Court limited the discretion of the federal courts by requiring greater population equality in federal court-ordered plans. This concern is not present where the court ordering the plan is not a federal court but a state court which has declared and acts to enforce state policy.

The language and reasoning of the Court in *Chapman* indicate that by "court-ordered" plan, the United States Supreme Court means a plan devised by a federal court to implement the requirements of the Fourteenth Amendment where,

because there is no state policy, the federal court would have discretion.

As the Court explained in *Chapman,* p 19, "[w]hen the plan is court ordered, there often is no state policy". "Absent particularly pressing features calling for multi-member districts, a *United States district* court should refrain from imposing them upon a State". (Emphasis supplied.) *Chapman,* by imposing higher standards on a United States district court when it is devising a remedial plan, with a view to confining the discretion of the federal courts where such discretion is not limited by state policy, does not limit the power of a state court to define state policy any more than it limits the power of a legislature or of a state apportionment board or commission to define state policy.

In *Connor* the United States Supreme Court reasoned that federal court-ordered plans were subject to more rigid standards of scrutiny because the federal courts do not have the authority to resolve sensitive questions of state policy:

"These high standards reflect the unusual position of federal courts as draftsmen of reapportionment plans. We have repeatedly emphasized that 'legislative reapportionment is primarily a matter for legislative consideration and determination,' *Reynolds v Sims,* 377 US 533, 586; 84 S Ct 1362; 12 L Ed 2d 506 (1964), for a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality. The federal courts possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name." *Connor,* 414-415.

In *Connor,* the Court considered whether there

was sufficient justification for a plan drawn by a United States district court which assertedly had been drawn along the boundary lines of local political subdivisions. The Court ruled that the plan was, on two bases, defective. "The district court failed here to *identify* any such 'unique features' of the Mississippi political structure as would permit a judicial protection of county boundaries in the teeth of the judicial duty to 'achieve the goal of population equality with little more than *de minimis* variation.' " (Emphasis supplied.) *Connor,* 420. That the "judicial duty" referred to is the duty of a court, generally a federal court, implementing the Fourteenth Amendment unguided by limitations on its discretion grounded in state policy, becomes clear from the other basis of decision. The Court said that the plaintiffs in that case had "submitted to the District Court an alternative Senate plan that served the state policy against fragmenting county boundaries better than did the plan the court ultimately adopted, and also came closer to achieving districts that are 'as nearly of equal population as practicable' ". The Court said "[i]n the absence of a convincing justification for its continued adherence to a plan that even in state policy terms is less efficacious than another plan actually proposed, there can be no alternative but to set aside the District Court's decree." *Connor,* 420-421.[32]

## B

Implicit in the *Chapman/Connor* rule, that

---

[32] Justice Blackmun, who wrote *Chapman,* concurred in part in *Connor,* p 426, in an opinion joined by Chief Justice Burger, observing that he did not "understand the Court to disapprove the District Court's decision to use county lines as districting boundaries wherever possible, even though this policy may cause a greater variation in district population than would otherwise be appropriate for a court-ordered plan. The final plan adopted in this case appears to produce even greater population disparities than necessary to effectuate the county boundary policy."

there are more stringent requirements for so-called "court-ordered" remedial plans, is that a state-ordered rather than a federal court-ordered plan can be drawn pursuant to criteria different than a federal court could employ in promulgating a plan.

Although a legislature is ordinarily given the power to reapportion itself, Michigan is among the states that has allocated the power to reapportion the Legislature to a body other than the Legislature. This Court has construed the Michigan Constitution and found within it the authority to declare the policies which should govern state legislative apportionment and to implement them.

In *Connor,* the United States Supreme Court spoke of the typical case (the legislature has the power to reapportion itself) that federal courts confront when they review state-initiated apportionment plans. There is no reason to suppose that the United States Supreme Court would regard a declaration by a state legislature of apportionment policy as more deserving of deference than a definitive construction by the state's highest court of the apportionment criteria that must be observed under the state's constitution.

The Court concluded, in *Chapman,* with the observation that "reapportionment is primarily the duty and responsibility of the State through its legislature *or other body* rather than of a federal court. *Reynolds v Sims,* 377 US 586; *Maryland Committee [for Fair Representation] v Tawes,* 377 US 676; 84 S Ct 1442; 12 L Ed 2d 595 (1964)." (Emphasis supplied.) The reference to *Maryland Committee v Tawes* has particular significance for the instant case because there the other state body was Maryland's highest court, the Court of Ap-

peals. The United States Supreme Court thus put a state's highest court on the same level as a state's legislature for purposes of the so-called "court-ordered" plan doctrine applicable where a federal court may be proceeding to apportion in the absence of "state policy".

The United States Supreme Court clarified what it meant when it said, in *Connor,* 414-415, that "a *court* will be held to stricter standards in accomplishing its task than will a state legislature" in the very next paragraph when it said "[t]hese high standards reflect the unusual position of *federal* courts as draftsmen of reapportionment plans". In the same paragraph it spoke twice again of the federal courts: "The *federal* courts by contrast possess no distinctive mandate", and "a *federal* court is left with the unwelcome obligation". (Emphasis supplied.)[33]

In *Gaffney v Cummings,* 412 US 735, 751; 93 S.

---

[33] In *Chapman, supra,* 18, the United States Supreme Court declared that the standards for evaluating whether multi-member districts are permissible "differ depending on whether a *federal* court or a state legislature has initiated the use". (Emphasis supplied.) In so holding the Court indicated that the special rule for what it characterized as a *"court-ordered* reapportionment scheme" (emphasis in original) was first adopted *(Connor v Johnson,* 402 US 690; 91 S Ct 1760; 29 L Ed 2d 268 [1971]) in the exercise of the Court's "supervisory power".

The United States Supreme Court has supervisory power over the federal courts. Its supervisory power does not extend to a state court. The requirements of *Chapman/Connor* were announced by the United States Supreme Court as limitations on the power of federal judges in promulgating remedial plans to effectuate compliance with the requirements of the Fourteenth Amendment.

Whether the *Chapman/Connor* rule is rooted in the Fourteenth Amendment or not, it is clear that less restrictive requirements are applicable to "state-ordered" plans. The *Chapman/Connor* limitation, whether announced by the Court in the exercise of its supervisory power over federal judges or as an aspect of *Reynolds v Sims* and therefore rooted in the Fourteenth Amendment, is not applicable to state-ordered plans. There is no reason to believe that the United States Supreme Court would distinguish between a plan drawn by a state authority on the basis of whether the authority is being exercised by one instrumentality of state government or another.

Ct 2321; 37 L Ed 2d 298 (1973), the Court said that
"state reapportionment is the task of local legisla-
tures *or of those organs of state governments
selected to perform it".* (Emphasis supplied.)

The use of the shorthand "court-ordered" plan,
*Connor,* p 417, the failure to say *"federal* court-
ordered" plan, cannot properly be read as impos-
ing the higher court-ordered plan standard on
plans drawn pursuant to state law, albeit law
enunciated by a state court rather than a state
legislature or apportionment board or commission.

It is an axiom of federalism, recognized by the
federal courts, that the federal government has no
power to override state law unless it conflicts with
the federal constitution. This Court's construction
of the Michigan Constitution is state law as much
as any legislative enactment or executive decree.
Absent infirmity under the federal constitution,
this Court's construction of the Michigan Constitu-
tion would be respected by the federal courts. To
apply different standards of scrutiny to apportion-
ment plans generated from state law depending on
their institutional source would permit the very
encroachment on state policy that *Connor* and
*Chapman* were meant to preclude.

C

In *Connor,* the United States district court found
that Mississippi had violated the Fourteenth
Amendment. The district court's discretion to mold
a remedy was founded upon the need to vindicate
a federal constitutional right. This Court's decision
in contrast is grounded upon the Michigan Consti-
tution. It represents a final declaration of state
law. The reapportionment plan ordered by this
Court has been drawn to comply with the require-
ments of the Michigan Constitution and not as a

temporary remedial expedient to remedy a failure to conform to the requirements of the federal constitution.

When this Court decided that the provisions of the Michigan Constitution providing apportionment rules and for an apportionment commission were no longer maintainable, it was faced with the question what law would govern redistricting and apportionment until the people acted—whether there were any state law requirements or only federal law requirements. The Court concluded that there were state law requirements as well as federal law requirements. In directing that the redistricting and reapportionment be in accordance with the approved criteria, unless the Legislature and the Governor could agree on an alternative plan, the Court manifestly was articulating state law requirements as there are no such federal requirements.

The source of the Court's authority to provide such requirements is its power to construe the Michigan Constitution. As part of its consideration in the instant case of whether the apportionment rules and the provisions for the apportionment commission are as a matter of Michigan constitutional law severable and survived the partial invalidity under the Fourteenth Amendment of the apportionment rules, the Court considered whether, if those provisions were not severable, a proper construction of the Michigan Constitution empowered this Court to determine how the apportionment and redistricting of the state shall be conducted in the interim before the people act.

It was the conclusion of this Court that the Michigan Constitution empowers this Court to make such determination. Implicit in the Court's decision are firstly, that the rule authorizing the

drawing of a plan in accordance with the approved criteria and the rule authorizing the Legislature and the Governor to adopt a superseding plan, were both authorized by the Michigan Constitution; and secondly, whatever the source of those rules, they are requirements of state law rather than federal law. The Court, in the exercise of its art 6, § 1 judicial power, declared that these are state law requirements which are authorized by the Michigan Constitution.[34]

---

[34] A federal court "remedial" plan may be ordered to provide for a failure of a state apportioning authority to exercise its power to reapportion in a manner compliant with federal constitutional requirements. This Court's "remedy" does not concern a failure to act, but the power to act. This Court's decisional "remedy" determines where the state apportioning authority resides. The *exercise* of that power, albeit at this Court's directive, is not, again in contrast with a federal court-ordered remedial plan, remedial of a *non-exercise* or of a *non-compliant* exercise of the state apportioning power.

This Court construed this state's constitution, in the exercise of the art 6, § 1 judicial power, and decided where the state power to reapportion resides. The Court concluded that the criteria prescribed in the constitution should be observed and applied but not by the legislative apportionment commission.

Mr. Apol is the "agent" of the Court in the sense that he was appointed by the Court. His charge, however, was to exercise the state apportioning authority in compliance with the criteria found in this state's constitution. Mr. Apol was not given broad-ranging discretion to reapportion the state, but a duty to observe and implement criteria which largely eliminate the exercise of discretion.

When questions arose regarding the application of the criteria, Mr. Apol put them to the Court, and the Court, in responding, again exercised the art 6, § 1 power to construe the constitution.

There may, indeed, be little distinction between what Mr. Apol has done and what the legislative apportionment commission would have been required to do if it had been preserved. Both derived their authority from the Michigan Constitution and both were required to observe the criteria found in the 1963 Michigan Constitution as construed by this Court.

Although this Court was not explicit regarding what state constitutional requirements would apply to a redistricting and reapportionment plan resulting from the "collective action" of the Legislature and the Governor, there is no inherent inconsistency in the alternative remedies provided by the Court: reapportionment in accordance with a plan drawn by Mr. Apol pursuant to the criteria set forth in the March 25 opinion, and reapportionment by the "collective action" of the Legislature and the Governor in a manner "consistent with federal and state constitutional requirements". While the Court did

## D

Assuming that the Court's remedy seeking to preserve Michigan constitutional requirements is a "court-ordered" plan within the meaning of *Connor,* it does not follow that the Apol plan is invalid when subjected to more stringent review. In *Connor,* the United States district court had rejected an alternative plan that conformed more closely to the state policy against fragmenting county boundaries and produced less deviation from the ideal of population equality than the plan the district court ultimately adopted.

On its facts, *Connor* stands for the proposition that the neutrality of a court-ordered plan and the bona fides of a claim that the plan has been devised to adhere to a policy of observing local boundary lines will be questioned where alternative plans have been submitted to the court that accomplish this policy at less expense to federal interests.

The United States Supreme Court did not hold in *Chapman* that the 20% variance in maximum deviation in the plan formulated by the federal court was per se invalid. It held rather that "a population deviation of that magnitude in a court-ordered plan is constitutionally impermissible *in the absence of significant state policies or other acceptable considerations that require adoption of a plan with so great a variance"*. *Chapman,* 24. (Emphasis supplied.) The Court then proceeded to consider whether there was a policy of maintain-

not speak to the question of what state constitutional requirements would apply to collective action of the Legislature and the Governor, they might well have been found to be precisely the same as the criteria set forth in the March 25 opinion. When the opinion was filed it was uncertain whether the Legislature and the Governor would be able to agree upon a plan, and indeed, in the event, they did not agree upon a plan. This Court simply did not speak to a question that it might be unnecessary to decide.

ing local political boundary lines and concluded that the United States district court had erred in finding that North Dakota had such a state policy. The Court concluded that the "court-ordered plan" before it failed "to meet the standards established for evaluating variances in plans formulated by state legislatures *or other state bodies"*. *Chapman,* 26. (Emphasis supplied.) In stating that a court-ordered plan "must be held to higher standards than *a State's own plan"* (emphasis supplied), the Court clearly distinguished between plans ordered by district courts and plans formulated by state legislatures "or other state bodies". The Michigan Supreme Court is an "other state body" within the intendment of that distinction; this Court, in contrast with *Chapman,* has declared as a matter of state law that there is a state policy of preserving local political boundary lines.

The holding, in *Chapman,* was that a plan for the reapportionment of a state legislature, ordered by a court, must "ordinarily" achieve population equality with little more than *de minimis* variation, and, if there is more than a *de minimis* variation, it is the reapportioning court's responsibility to articulate precisely why a plan with minimum population variations cannot be adopted because of *"important and significant state considerations* [which] *rationally mandate departure from these standards"*. *Chapman,* 27. It is thus clear that even a federal court may depart from population equality to achieve a state goal. The federal court would not then be acting in the exercise of discretion but rather would be guided by the state goal.

### E

In conclusion, a plan is a "state-ordered" plan

for purposes of the *Chapman/Connor* rule, whether the plan is drawn by a legislature, an apportionment board or commission, or some other person, agent, or body who derives authority under state law, whether that authority is found in the state's constitution, a statute, or a judicial opinion of a state court. The critical question is whether the plan was drawn to comply with state and federal law requirements, or only with federal law requirements. To the extent that the plan is drawn to comply with state law requirements (as well as the federal law requirements enunciated in *Reynolds v Sims),* the higher *Chapman/Connor* standard does not apply.

The higher standard for "court-ordered" plans prescribed by the *Chapman/Connor* rule applies to the extent that a court-ordered apportionment is not guided or controlled by state policy. Where a court-ordered apportionment is guided or controlled by state policy, the same reviewing standard applies to a court-ordered plan as would apply to a plan drawn by the state legislature or other state body having apportioning authority.

A federal court's determination that there is a state policy will be reviewed by a strict standard; to facilitate such review, it is the reapportioning court's responsibility to articulate precisely, and, presumably, to support with evidence, its determination that there are important and significant state considerations justifying departure from the higher standards applicable to a federal court-ordered plan drawn unguided by state policy.

The court-ordered plan doctrine does not, thus, preclude a federal court from ordering a departure from *de minimis* population variance to achieve a state goal.[35] The *Chapman/Connor* rule simply

---

[35] In *Upham v Seamon,* — US —; 102 S Ct 1518; 71 L Ed 2d 725

requires that it be clear that there is such a state goal and that the departure be limited to what is necessary to achieve that goal. The court-ordered plan doctrine does not impose a different standard for court-ordered plans than for plans drawn by a legislature or other state body where there is in fact a legitimate, rational state goal and the plan seeks to achieve such goal at the least cost to the federal principle of equality of population.

The court-ordered plan doctrine imposes higher standards where, although the state has not clearly identified a state goal, a federal court finds that there is a state goal.

In the instant case, this Court has determined that there is a state goal. It has the authority, although a Fourteenth Amendment claim is involved, to make that determination absent evidence that the Court's determination is disingenuous.

No claim is made that this Court's determination is disingenuous. There clearly is adequate justification for its determination that there is a state policy of preserving political boundary lines.[36]

There is no evidence of a result impermissible under the federal constitution; it has not been asserted or shown that the result disadvantages minorities.[37]

---

(1982), the United States Supreme Court reversed a three-judge district court because a court-ordered reapportionment plan did not observe announced state policies. The United States Supreme Court declared that a district court is not free to substitute its own completely new plan when it finds that some part of a state's reapportionment plan is violative of the federal constitution, its power being limited to making such modifications as are necessary to cure the federal constitutional deficiency.

[36] *In re Apportionment of State Legislature—1982,* 413 Mich 158, *supra* (fns 18, 19).

[37] Even if the result disadvantages minorities, it would appear that that would not be determinative absent evidence that there was an intent to bring about that result. *Whitcomb v Chavis,* 403 US 124; 91

IV

(1)

At the May 5 hearing on the motion for rehearing, counsel for the Democratic commissioners pointed out that while the range of divergence in *Mahan* was 16.4%, there were other characteristics of the plan approved in *Mahan.* The average deviation in the *Mahan* plan for both houses was +3.89%, the corresponding figure for the revised Apol plan is +5.18%.

While *Mahan* could be distinguished on that basis, it does not appear that the United States Supreme Court would distinguish the instant case from *Mahan* on that basis. No decision of the United States Supreme Court has turned on the average deviation and, therefore, the argument based on the average deviation is without precedential support.

It appears that the primary concern or criterion emphasized in the decisions of the United States Supreme Court is the range of divergence from absolute equality of the districts with the greatest and least population. Whether that is a correct view of the matter may become clear if the United States Supreme Court issues opinions—as it has following each decennial census—enlarging upon the views which have been expressed by the Court in the opinions filed to date. Additional expressions from the Court may not, however, be forthcoming for weeks or even another year or so.

In *Mahan,* following its earlier statements in

S Ct 1858; 29 L Ed 2d 362 (1971). There is no claim in the instant case that there is such intent.

*Reynolds* and *Abate*,[38] the United States Supreme Court, in approving a Virginia legislative districting plan drawn to maintain the integrity of political subdivisions, declared that this was a rational state policy, that "[i]t can reasonably be said, upon examination of the legislative plan, that it does in fact advance that policy", that while the "16-odd percent maximum deviation * * * may well approach tolerable limits, we do not believe it exceeds them", that Virginia had "not sacrificed substantial equality to justifiable deviations" and that the population disparities "result in a *maximum* percentage deviation that we *hold* to be within tolerable constitutional limits". (Emphasis supplied.)

That language means that the controlling limitation is the "maximum percentage deviation". In the March 25 opinion, this Court considered the "range of allowable divergence" from the federal goal of population equality, noted that following the *Mahan* approval of a divergence of 16.4% courts generally have concluded that 16.4% is the range of allowable divergence, and, recognizing that the decisions of the United States Supreme Court do not impose an absolute standard, declared that the range of allowable divergence under the federal constitution shall be deemed to be 16.4% (91.8%-108.2%) until the United States Supreme Court declares otherwise.[39]

In adopting 16.4% as the range of allowable divergence, this Court said that "[a]n apportioning authority is justified in adopting only that degree of divergence from population equality essential to

---

[38] *Abate v Mundt,* 403 US 182; 29 L Ed 2d 399; 91 S Ct 1904 (1971).

[39] *In re Apportionment of State Legislature—1982,* 413 Mich 158, *supra* (fn 17).

achieve the state goals. Once achieved, the flexibility is at an end. Accordingly, divergence from the federal goal of population equality is permitted only to the extent necessary to permit achievement of the state goals of observing the boundary lines of local units of government and compactness." *Ante,* p 127.

A corollary to the concept that "an apportioning authority is justified in adopting only that degree of divergence from population equality essential to achieve the state goals" is the concept that an apportioning authority may or must, to achieve the state goals, adopt that degree of divergence from population equality essential to achieve them.

The state goals identified in the March 25 opinion are rooted in the constitution of this state. This Court directed that they be achieved to the maximum extent possible consistent with federal constitutional limitations. Since it was the Court's best judgment that the controlling criterion was the "maximum percentage deviation", it directed that, until the United States Supreme Court declares otherwise, the maximum percentage deviation in *Mahan* (for a districting and apportionment plan drawn along the boundary lines of political subdivisions) would be deemed applicable to the districting and apportionment of the Michigan Legislature in the application of a similar criterion of following county, city, and township boundary lines.

When this Court directed that the boundary lines be drawn to maximize the achievement of those state goals within the federal limitation it did not know what the average deviation would be.

Now that the plan has been prepared, it appears that the average deviation is greater for the Michigan plan than for the Virginia plan. This may be a consequence of the greater rigidity of the Michigan criteria which require that first county lines be drawn and only then (in the larger counties having more than one senator or representative) may the city and township lines be drawn. It appears that the Virginia plan was drawn along both county and city lines without seeking to maximize the preservation first of county lines. The effort to achieve the maximum adherence to the Michigan goals of preserving the boundary lines first of counties and second of cities and townships does tend to produce concentrations of population at both ends of the 16.4% range of divergence and a higher average range of deviation than the Virginia plan. This is a result of the adherence to the state goal.

The United States Supreme Court, having stated that preservation of political subdivision boundary lines is a rational state goal, would no doubt expect that states having such goals would seek to achieve them to the maximum extent possible consistent with federal constitutional limitations. To merely point out that the consequence of pursuit of those state goals is to bring about a higher average deviation is not to state a reason for departing from the state goal.

For the United States Supreme Court to hold that average deviation is a limitation would be to add a limitation not expressed in *Mahan* on the legitimate pursuit of a rational state goal. There is no reason to anticipate that the United States Supreme Court will impose such a further limita-

tion on pursuit of the state goal of preserving the boundary lines of local units of government.[40]

If the Court does impose such an additional limitation, it would allow the states adequate time to conform their plans to these new limitations as it would understand that, absent such a statement from the United States Supreme Court, the states would seek to maximize achievement of the state goal within the criterion that had been articulated by the Court in the body of the *Mahan* opinion. To state it differently, the United States Supreme Court would not expect that plans would be drawn in the application of limitations drawn from a description of other features of the Virginia plan which the court did not treat as determinative in *Mahan,* and if the Court were to elevate such other factors to constitutional importance it would provide adequate time to make required changes.

We appreciate that the opinions of the United States Supreme Court do frequently mention average deviation as well as maximum deviation. We think that the Court might become concerned with average deviation if the plan were drawn without adherence to the kind of rigid constitutionally rooted state criteria of the kind required to be followed in the instant case. Clusters of population at extreme limits of the range of divergence might indicate a purposeful gerrymander to achieve some

---

[40] Mr. Justice Brennan's opinion in chambers explaining his granting of a stay of a three-judge district court order reapportioning New Jersey for congressional districting and reinstating the legislative congressional reapportionment plan indicates that *Kirkpatrick v Preisler,* 394 US 526; 89 S Ct 1225; 22 L Ed 2d 519 (1969), will likely be read by the United States Supreme Court as allowing the New Jersey legislature "some latitude", thereby suggesting that the United States Supreme Court may loosen rather than tighten margins. *Karcher v Daggett,* 455 US 1303; 102 S Ct 1298; 71 L Ed 2d 635 (1982) (Brennan, J., in chambers).

impermissible goal, to the advantage of one part of the body politic over another. Where the plan has been drawn either by a state legislature or a judge or a group of judges, in the exercise of a broad ranging discretion, the United States Supreme Court might require narrower margins of average deviation to protect against abuse of discretion.

The criteria adopted by this Court, however, are intended to leave little room for the exercise of discretion. The population cluster at the outer limits of the 16.4% range of divergence is not the result of the exercise of discretion, it does not reflect a purpose to give advantage to one group over another, but rather is simply the consequence of the Court's adherence with a high degree of faithfulness to what it perceives to be the requirements of Michigan Constitutions regarding the exercise of the power to reapportion and redistrict legislative seats. In a case such as this where it cannot be asserted that the cluster at the outer limits of the range of divergence is the result of anything operating other than adherence to the state goal, average deviation is not a determinative factor.

(2)

In *Mahan,* the Court, in its description of the plan there before the Court, mentioned *average* percentage variance and also the minimum population percentage necessary to elect a majority and also the number of districts within 4% of perfection, 6%, and other like descriptive information.

In its analysis of earlier decisions and generally, however, the Court spoke only of the *maximum* percentage deviation. It referred to the congressio-

nal reapportionment cases of *Kirkpatrick*[41] and *Wells*[42] and the *maximum* percentage deviation in those cases. It also referred to the *maximum* percentage deviation in the state legislative apportionment case of *Swann v Adams*[43] and the county apportionment case of *Abate v Mundt*. It spoke of the "16-odd percent *maximum* deviation" in *Mahan* itself. It concluded that "[t]he population disparities that are permitted thereunder result in a *maximum* percentage deviation that we *hold* to be within tolerable constitutional limits" (emphasis supplied). The dissenting opinion referred to the number of persons in districts in which the population deviation from the ideal was more than 5% and more than 3%. But none of the reasoning of the majority includes any consideration of average or median deviation.

In *Mahan*, the district court had modified the legislative plan, reducing the variance to slightly over 10%. The district court had divided the population of one county to the point where the Court could say that "[t]he opportunity of its voters to champion local legislation relating to Scott County is virtually nil. The countervailing benefit resulting from the court's readjustment is the fact that the first district's deviation from the ideal is now reduced to 1.8%." Of another change ordered by the district court, the Court said that "[i]n terms of practical politics, Virginia Beach complains that such representation is no representation at all so far as local legislation is concerned" and that the people transferred to reduce the deviation "have in that respect been effectively disenfranchised", p

[41] *Kirkpatrick v Preisler, supra.*

[42] *Wells v Rockefeller,* 394 US 542; 89 S Ct 1234; 22 L Ed 2d 535 (1969).

[43] *Swann v Adams,* 385 US 440; 87 S Ct 569; 17 L Ed 2d 501 (1967).

324. It comes through quite clearly from a reading of the Court's opinion that the Court associated itself with those arguments, and that it found them persuasive in holding that the district court had erred in modifying the legislative plan to achieve a reduction in the deviation from 16-odd% to 10%.

In *Chapman,* the Court spoke only of the maximum range of deviation and did not mention in its description of the plan, let alone in the argument, the average or median deviation. The Court, without referring to average or median deviation, said that in *Gaffney* it had "permitted a deviation of 7.83% with no showing of invidious discrimination. In *White v Regester* [412 US 755; 93 S Ct 2332; 37 L Ed 2d 314 (1973)], a variation of 9.9% was likewise permitted." The percentage deviations referred to were maximum percentage deviations.

The Court, in *Chapman,* p 24, spoke of the maximum deviation as *"this measure* of acceptable deviation from population equality"* (emphasis supplied) stating that it had been "developed in cases that concerned apportionment plans enacted by state legislatures".

In sum, median or average deviation has not been regarded by the United States Supreme Court as a relevant criterion where the deviation is justified by showing a state policy and adherence to that policy.[44] Where the deviation is justi-

---

[44] In deciding whether a deviation from equality is *de minimis,* the United States Supreme Court has adverted in its reasoning to average percentage variance. *Gaffney v Cummings,* 412 US 735, 742; 93 S Ct 2321; 37 L Ed 2d 298 (1973); *White v Regester,* 412 US 755, 764; 93 S Ct 2332; 37 L Ed 2d 314 (1973). Where the deviation is *de minimis,* there is no need to justify the deviation on state policy grounds.

Although it is far from clear that the Court intended to limit the scope of its holding in *Gaffney* and *White v Regester* by making

fied on state policy grounds, a maximum deviation of 16.4% is permissible without regard to the median or average deviation.

## V

It is asserted that the Court has misstated Michigan history because Michigan has not used counties as the basic building blocks for legislative apportionment.

While Michigan does indeed have a history of population-based apportionment, that principle has been expressed in Michigan Constitutions together with the principle that county, city and township lines should be followed in the design of election districts.

No Michigan Constitution has provided for the allocation of legislative seats on a *purely* population basis. No Michigan Constitution has permitted the breaking of a single county line.[45] One can of course disagree regarding the apportionment principles that should be extracted from this history and their relative merit, but one cannot deny that throughout its history Michigan has remained firmly committed to avoiding the fragmentation of county lines and, more recently, when the population of some counties reached the point where more than one legislator was apportioned to some counties, avoiding the fragmentation of city and township lines.

median or average divergence part of the analysis where it is claimed that the deviation is *de minimis,* the *de minimis* rule—not requiring justification of a deviation from equality on state grounds—was not relied on by this Court but rather the *Mahan* rule requiring justification on state grounds.

[45] *In re Apportionment of State Legislature—1982,* 413 Mich 158, *supra* (fns 18, 19).

It is not asserted that there is not this textual historical commitment; the Court's decision is challenged because it reflects a theory of "political unit or boundary representation". It is contended that such a theory finds no warrant in Michigan history and has been disparaged by federal decisions.

This contention mischaracterizes the Court's decision and the view that it has taken of the historical record. Concededly, Michigan does not have and never has opted for apportionment of the Legislature on a "political unit" basis. But to say that Michigan has not opted for "political unit" representation is not to say that it has not recognized the importance of political unit boundary lines and has not followed them in the drawing of election districts.

Michigan has a consistent constitutional history of combining less populous counties and subdividing populous counties to form election districts. As a result, county lines have remained inviolate. The reason for following county lines was not the "political unit" theory of representation but rather that each Michigan Constitution has required preservation of the electoral autonomy of the counties.

The argument confuses the political unit basis with drawing lines to preserve the autonomy of local political subdivisions. The United States Senate is organized on a political unit basis—every state receives the same number of senators as every other state without regard to population. The United States House of Representatives is apportioned on a population basis; although not organized on a political unit basis, the boundary lines of the states are nevertheless preserved—no

state line is broken. No representative to Congress represents people living in two separate states.[46]

## VI

It is asserted that the Court did not provide the parties an opportunity to discuss what the proper remedy would be should the Court decide that Const 1963, art 4, §§ 2-6 were not severable and that this constitutes a denial of due process.

On February 24, 1982, the Court indicated in an order addressed to the parties that it might conclude that the federal invalidation of the weighted land area/population formulae of the 1963 Constitution terminated the authority of the apportionment commission. Both parties chose to argue that the apportionment commission survived the invalidation of the formulae. Neither took the opportunity to express a view as to what the Court should provide if it concluded that the commission did not survive.

One might argue that the Court asked only about the commission's survival and not about what would happen in the event the commission did not survive. This, however, would be to confine

---

[46] Much of the opinion in *Reynolds v Sims, supra,* pp 572-577, is devoted to a discussion of the political unit basis. In many states, at least one house was composed of the representatives of local units of government, *e.g.,* counties, just like the United States Senate. The Court explained at great length why the Congress could be apportioned this way but a state legislature could not.

Michigan has not had that kind of legislative apportionment—one senator per county. But Michigan did subdivide populous counties and combine the less populous counties with county lines always being inviolate. The political unit theory is not implemented simply by using county lines as a basis for drawing election district lines.

The political unit basis was originally adopted for representation in the county board of supervisors. See *Apportionment of Wayne County —1982,* 413 Mich 224, *post.*

the boundaries of the question posed in an artificial and narrow manner. The question of remedy follows so closely upon the question of the commission's survival that it is, in fact, virtually the same question.

In all events the Court has provided the parties with an opportunity for oral argument and has carefully considered the arguments advanced both in the motion for rehearing and at the hearing, and this opinion responds thereto.

## VII

It was contended, at the public hearing, that the Apol plan is defective because Wayne County is entitled to 9.591 senators and should, therefore, have been apportioned 10 senators.

Wayne could, within the population variance limits of 91.8%-108.2%, be allocated either 9 or 10 senators without breaking its boundaries. If 9 senators are apportioned to Wayne, the average Wayne district is 106.5% of the statewide ideal; if 10 senators are apportioned to Wayne, the average Wayne district is 95.9% of the statewide ideal.

Similarly, in the House, Wayne County can be apportioned between 26 and 30 representatives. If 26 representatives are apportioned to Wayne County, the average Wayne County district is 106.7% of the statewide ideal; if 30 representatives are apportioned to Wayne County, the average Wayne County district is 92.5% of the statewide ideal. Oakland County (immediately north of Wayne County) presents the same problem in the House, because either 12 or 13 representatives can be apportioned to Oakland County. If 12 represen-

tatives are apportioned to Oakland County, the average Oakland County district is 100.1% of the statewide ideal; if 13 representatives are apportioned to Oakland, the average Oakland district is 92.4% of the statewide ideal.

The criteria approved by the Court do not address this apportionment question directly, but leave it to be decided implicitly by the other criteria. Whether Wayne County is apportioned 9 or 10 senators is determined by identifying the one Senate plan that breaks the fewest county lines statewide, or shifts the fewest cities or townships statewide, or shifts the fewest people statewide.[47]

Wayne County is apportioned 9 senators in both the Apol and Ketron Senate plans. Although Mr. Apol was able to discover a Senate plan that apportioned 10 senators to Wayne and broke 4 county lines (the same number of county line breaks as in Mr. Apol's April 27 plan), that 10-senator plan was not the best plan because it required a shift of 9 cities or townships statewide, while Mr. Apol's April 27 plan, which apportioned Wayne 9 senators, required a shift of only 7 cities or townships statewide.

In the House, both Mr. Apol and Ketron, Inc., working independently, generated House plans that broke 10 county lines, and both plans apportioned Wayne 29-1/2 representatives (the additional population to complete the 30th district in both plans was drawn from Monroe County) and apportioned Oakland 12 representatives.

In light of the political importance of this apportionment decision, consideration was given to

---

[47] See part IB, ¶ 7, *supra*.

whether there is another, direct method of fairly resolving the apportionment question first; only after the apportionment question had been resolved would the search begin for the plan with the minimum number of county line breaks statewide.

The framers of the 1963 Constitution considered a similar problem, the precise number of legislators to whom the larger counties as a group and the smaller counties as a group are, in the application of the constitution's apportionment rules, fairly entitled. Although this Court has held that those apportionment rules do not survive the invalidity under the Fourteenth Amendment of the weighted land area/population formulae, the constitution does suggest a method for resolving the apportionment question.

For the Senate, the constitution provided in art 4, § 2, that counties with 13 or more apportionment factors shall be entitled as a class to senators in the proportion that the total apportionment factors of such counties bear to the total apportionment factors of the state, "computed to the nearest whole number". There were a total of 500 apportionment factors to be allocated to all the counties, 400 on the basis of county population and 100 on the basis of county land area.

The significance of the number 13 becomes clear if one multiplies it by 38 (the number of senators to be allocated). The result is 494.

The constitution thus provided that in determining the apportionment of senators between the counties, the counties shall be divided into two classes—those entitled to one or more senators and

those entitled to less than one senator. It was recognized that in such a situation it would be necessary to decide whether the more populous or less populous counties, and which county among them, would be entitled to the odd senator. The constitution provided a simple and fair means of resolving that question, which is based in part on the "method of equal proportions" used in the decennial apportionment of congressmen among the states.[46] If the nearest whole number gave it to the large counties, so be it; and if it gave it to the smaller counties, so be it.

Applying this formula (and, by dividing all the numbers by five,[49] eliminating the weighted land area/population formulae), it appears that Wayne County was not entitled to a tenth senator:

| County | Number of Senators to Which Entitled Based on Population | Number of Senators Assigned in the April 27 and in the Revised Apol Plan |
|---|---|---|
| Wayne | 9.591 | 9 |
| Oakland | 4.151 | 4 |
| Macomb | 2.849 | 3 |
| Kent | 1.823 | 2 |
| Genesee | 1.848 | 2 |
| Ingham | 1.130 | 1 |
| Washtenaw | 1.086 | 1 |
| | 22.478 | 22 |

The constitution provided a different method of apportionment in the House, but that method cannot be applied after the invalidation of the weighted land area/population formulae.[50]

---

[48] See Convention Comment, Const 1963, art 4, § 2.

[49] $13 \div 5 = 2.6 \times 38$ senators $= 98.8$. Accordingly, a county with at least 2.6% of the state's population would have been part of the larger county group.

[50] The House formula provided that any county with at least 0.7% of the state population constituted a representative area, and counties

It would, however, be possible to apply the Senate apportionment method in both houses. In the Senate, Wayne County would be entitled to 9 senators. In the House, Wayne County would be entitled to 28 (not 29-1/2) representatives and Oakland County would be entitled to 12 (it was apportioned 12).[51]

The flaw in this method is that it artificially divides the counties into two groups, treating one group differently than another, thereby possibly

with less than 0.7% should be combined with other small counties until there was a total population of at least 0.7%. (The convention comment to art 4, § 3, states that, based on the 1960 census, there would have been 40 such legislative areas.) After each area was apportioned one representative, the remaining representatives were to be apportioned to the representative areas by the method of equal proportions. That method cannot be applied today because such representative areas are no longer permissible under the federal constitution because they create excessive population divergence. One cannot first district the state and then examine the districts to determine the number of representatives Wayne and Oakland Counties are entitled to, because any such districting necessarily decides the question.

[51]

| County | Number of Representatives to Which Entitled Based On Population | Number of Representatives Assigned in the April 29 Apol Plan |
|---|---|---|
| Bay | 1.423 | 1 |
| Eaton | 1.049 | 1 |
| Genesee | 5.349 | 5 |
| Ingham | 3.272 | 3 |
| Jackson | 1.799 | 2 |
| Kalamazoo | 2.522 | 3 |
| Kent | 5.279 | 5 |
| Lenawee | 1.068 | 1 |
| Livingston | 1.191 | 1 |
| Macomb | 8.249 | 8 |
| Monroe | 1.599 | 2 |
| Muskegon | 1.871 | 2 |
| Oakland | 12.016 | 12 |
| Ottawa | 1.866 | 2 |
| Saginaw | 2.708 | 3 |
| St. Clair | 1.648 | 2 |
| Washtenaw | 3.144 | 3 |
| Wayne | 27.765 | 28 |
| | 83.818 | 84 |

generating results at least as questionable as those generated by the method the Court had adopted in and pursuant to the March 25 opinion. For example, in the Senate, Kalamazoo County is entitled to 0.8713 senators. Because Kalamazoo County is entitled to less than one senator, it would be grouped with all the other counties entitled to less than one senator. Kalamazoo County's ultimate fate—whether Kalamazoo County residents will be slightly underrepresented or slightly overrepresented—will be decided by the indirect method of choosing the one plan that breaks the fewest county lines statewide, or shifts the fewest cities or townships statewide, or shifts the least population statewide. For the same reasons that Wayne County residents regard as crucial the decision whether Wayne County is apportioned 9 senators, making each Wayne County district slightly underrepresented, or 10 senators, making each Wayne County district slightly overrepresented, Kalamazoo County residents regard as crucial the size and character of the district they are ultimately placed in.

While Kalamazoo County's representation is indeterminate, this method would guarantee to Genesee County, which is entitled to 1.848 senators, two full senators. Such a two-tier method of apportionment would be unjust. If Genesee County, at 1.848, is "entitled" to a second senator, why is Kalamazoo County, at 0.8713, not "more entitled" to a *first* senator?

It is no answer to say that the federal constitution does not permit the allocation to Kalamazoo County of a full senator. The Kalamazoo County line could be broken in such a way as to shift the necessary number of people from an adjacent

county to bring the Kalamazoo County district just within the 91.8%-108.2% range. The Michigan rule of following county lines to the fullest extent this is possible statewide consistent with federal limitations would then have to yield to such a concept of justice and "entitlement" in the apportionment of legislators. The historical practice of following county lines never rose to the level of a principle of justice; it has always been simply a device for controlling gerrymandering, facilitating elections and preserving communities of interest.

Once the rule of following county boundary lines yielded to the principle of "entitlement", the Court could not pretend to have a neutral and objective set of guidelines. Subjective decisions would have to be made concerning which counties are most "entitled" to be overrepresented, and more subjective decisions would have to be made regarding how such an "entitled" county's preferential county line break should be accomplished.[52]

The Court's adopted method of apportionment— indirect apportionment by minimizing the number of county line breaks statewide—yields admittedly arbitrary results. That is also, however, its principal virtue: it provides an objective and neutral resolution to an intractable problem. Perhaps the Court would not implement the results of this method if it had produced a different result—for example, if Wayne County were underrepresented in both houses—but given the actual result, with Wayne County overrepresented in one house and underrepresented in the other, the Court imple-

---

[52] It is not being suggested that the framers made a mistake in adopting this rule. The apportionment system set forth in the constitution was a delicate system of compromises; the smaller counties might lose unjustly under this apportionment rule, but would benefit under the weighted land area/population formulae.

ments the results of this admittedly imperfect method.

## VIII

At the public hearing and in written submissions it has been urged that the Court should amend the criteria to include the concepts of "political fairness" and preservation of existing legislative districts.

There are many concepts of political fairness: partisan political fairness, racial political fairness, ethnic political fairness, sexual political fairness, and, for persons interested in particular issues, issue political fairness. Implicit in the decision of the Court and its failure to amend the criteria is its decision that the Michigan Constitution and state law does not comprehend the criterion of political fairness.

While continuity of representation is indeed a value, it is a value which finds expression in the concept of preserving the autonomy of local political subdivisions. If preservation of existing political subdivisions had been more assiduously pursued in the 1972 legislative apportionment, there would, in the 1982 legislative apportionment, have been perforce greater preservation of existing legislative districts. It is again relevant that the 1972 apportionment, before *Mahan* was decided, was based on a mistaken reading of the reach of *Reynolds v Sims.*[53]

While the 1963 Constitution provides for the

---

[53] *In re Apportionment of State Legislature—1982,* 413 Mich 119, *supra* (part II, A).

preservation of existing Senate districts in the less
populous parts of the state (where counties are
combined to form a district),[54] it does not contain a
like requirement for the more populous counties
and contains no such requirement for the House,
thereby implicitly rejecting preservation of exist-
ing districts as a factor for Senate districts in
counties entitled to one or more senators and for
all House districts.

## IX

The Court has retained jurisdiction with a view
to ordering such changes in the plan as may be
required to overcome errors or omissions and to
provide for an orderly election and to make any
changes required to comply with a superseding
opinion.[55]

---

[54] Const 1963, art 4, § 2, ¶ (2); see *In re Apportionment of State
Legislature—1982,* 413 Mich 158, *supra* (fn 19).

[55] In *Scott v Germano,* 381 US 407, 408-409; 85 S Ct 1525; 14 L Ed
2d 477 (1965), the Illinois Supreme Court, after holding the apportion-
ment of the Illinois Legislature unconstitutional in *People v Kerner,*
32 Ill 2d 212, 225; 205 NE2d 33 (1965), "retained jurisdiction of the
case 'for the purpose of taking such affirmative action as may be
necessary to insure that the 1966 election is pursuant to a constitu-
tionally valid plan'". The United States district court, which was
conducting proceedings on the same question simultaneously, declined
to delay its own proceedings until the Illinois Supreme Court could
complete its efforts to ensure a constitutional reapportionment plan.
The United States Supreme Court reversed: "We believe that the
District Court should have stayed its hand. The power of the judiciary
of a State to require valid reapportionment or to formulate a valid
redistricting plan has not only been recognized by this Court but
appropriate action by the States in such cases has been specifically
encouraged." Similarly, see *Silver v Jordan,* 263 F Supp 627 (CD Cal,
1966).

This Court will act expeditiously to provide a hearing and prompt
adjudication of all state and federal issues that may be further
presented by the parties, their privies and all persons who may not
now be precluded by "law or usage in the courts" of this state (28
USC 1738) by reason of the orders entered in this proceeding. See text
accompanying fn 28.

APPENDIX A

COUNTY, CITY AND TOWNSHIP LINE BREAKS

SENATE

*County Line Breaks*

District 11

The following one township of Washtenaw County was moved to create a district.

Washtenaw County
    Saline Township        1,221

| | | |
|---|---|---|
| Lenawee County | 89,948 | |
| Monroe County | 134,659 | 225,828 |

District 13

The following 3 cities and townships of Kalamazoo County were moved to create a district. *(Note:* 43 people of Kalamazoo Township are located within an island in Kalamazoo city—not considered a movement of a township.)

| | | |
|---|---|---|
| Kalamazoo County | | |
|     Cooper Township | 8,434 | |
|     Kalamazoo city | | |
|       +43 people Kalamazoo Township | 79,765 | |
|     Richland Township | 4,677 | |
| | 92,876 | |
| Barry County | 45,781 | |
| Ionia County | 51,815 | |
| Montcalm County | 47,555 | 238,027 |

District 31

The following one township of Ottawa County was moved to part of Kent County to create a district.

| | | |
|---|---|---|
| Ottawa County | | |
| Jamestown Township | 3,546 | |
| Kent County (part) | 220,355 | 223,901 |

District 20

The following one township of Ingham County was moved to create a district.

| | | |
|---|---|---|
| Ingham County | | |
| Delhi Township | 17,144 | |
| Calhoun County | 141,557 | |
| Eaton County | 88,337 | 247,038 |

## SENATE

### *City/Township Line Breaks*

One city line was broken (Detroit).

District 10

Wayne County

The following population of the City of Detroit was moved to create a district.

| | | |
|---|---|---|
| Detroit (part) | 17,168 | |
| Wayne County (part) | 241,518 | 258,686 |

## HOUSE

### *County Line Breaks*

District 45

The following 4 cities and townships of Cass

County were moved to Van Buren County to create a district.

Cass County
| | | |
|---|---|---|
| Dowagiac city | 6,307 | |
| Pokagon Township | 2,394 | |
| Silver Creek Township | 3,361 | |
| Wayne Township | 2,699 | |
| | 14,761. | |
| Van Buren County | 66,814 | 81,575 |

## District 54

The following 2 townships of Barry County were moved to Allegan County to create a district.

Barry County
| | | |
|---|---|---|
| Thornapple Township | 4,298 | |
| Yankee Springs Township | 2,251 | |
| | 6,549 | |
| Allegan County | 81,555 | 88,104 |

## District 23

The following 2 cities and townships of Ingham County were moved to Jackson County to create a district.

Ingham County
| | | |
|---|---|---|
| Leslie city | 2,110 | |
| Leslie Township | 2,190 | |
| | 4,300 | |
| Jackson County (part) | 74,016 | 78,316 |

## District 21

The following 2 townships of Wayne County were moved to part of Monroe County to create a district.

Wayne County
| | |
|---|---|
| Huron Township | 9,849 |

|                         |         |        |
| ----------------------- | ------- | ------ |
| Sumpter Township        | 11,112  |        |
|                         | 20,961  |        |
| Monroe County (part)    | 56,415  | 77,376 |

## District 48

The following 2 cities and townships of Calhoun County were moved to part of Kalamazoo County to create a district. *(Note:* There is a township island of Battle Creek Township consisting of 5 people which is wholly contained within the City of Battle Creek and is not considered a movement of that township.)

Calhoun County

|                           |        |        |
| ------------------------- | ------ | ------ |
| Bedford Township          | 10,157 |        |
| Battle Creek city +       |        |        |
| 5 people of Battle        |        |        |
| Creek Township            | 35,729 |        |
|                           | 45,886 |        |
| Kalamazoo County (part)   | 42,089 | 87,975 |

## District 87

The following 3 townships of Livingston County were moved to Shiawassee County to create a district.

Livingston County

|                      |        |        |
| -------------------- | ------ | ------ |
| Cohactah Township    | 2,436  |        |
| Deerfield Township   | 2,611  |        |
| Oceola Township      | 4,175  |        |
|                      | 9,222  |        |
| Shiawassee County    | 71,140 | 80,362 |

## District 102

The following 2 cities and townships of Gratiot County were moved to Midland County to create a district.

Gratiot County

|                   |       |
| ----------------- | ----- |
| Bethany Township  | 1,526 |

| | | |
|---|---|---|
| St. Louis city | 4,107 | |
| | 5,633 | |
| Midland County | 73,578 | 79,211 |

District 86

The following 3 townships of Bay County were moved to part of Saginaw County to create a district.

| | | |
|---|---|---|
| Bay County | | |
|     Bangor Township | 17,494 | |
|     Hampton Township | 10,418 | |
|     Merritt Township | 1,676 | |
| | 29,588 | |
| Saginaw County (part) | 56,094 | 85,682 |

District 84

The following 3 townships of Tuscola County were moved to Lapeer County to create a district.

| | | |
|---|---|---|
| Tuscola County | | |
|     Arbela Township | 3,192 | |
|     Millington Township | 4,429 | |
|     Watertown Township | 2,122 | |
| | 9,743 | |
| Lapeer County | 70,038 | 79,781 |

District 78

The following 4 cities and townships of St. Clair County were moved to Sanilac County to create a district.

| | | |
|---|---|---|
| St. Clair County | | |
|     Burtchville Township | 3,069 | |
|     Clyde Township | 4,632 | |
|     Fort Gratiot Township | 8,496 | |
|     Port Huron city | 33,981 | |
| | 50,178 | |
| Sanilac County | 40,789 | 90,967 |

*Summary:* In the House Plan there are 10 county line breaks involving the movement of 27 cities and townships.

## HOUSE

### City and Township Line Breaks

District 32

*Wayne County*

The following population of Allen Park city was moved to Dearborn Heights city to create a district

| | |
|---|---|
| Allen Park city (part) | 15,687 |
| Dearborn Heights city | 67,706 |
| | 83,393 |

District 33

*Wayne County*

The following population of Westland city was moved to Garden City and Inkster city to create a district.

| | |
|---|---|
| Westland city (part) | 6,955 |
| Garden City | 35,640 |
| Inkster city | 35,190 |
| | 77,785 |

District 34

*Wayne County*

The following population of Livonia was moved to Redford Township to create a district.

| | |
|---|---|
| Livonia city (part) | 22,991 |
| Redford Township | 58,441 |
| | 81,432 |

District 37

*Wayne County*
The following population of Canton Township
was moved to create a district.

| | |
|---|---:|
| Canton Township (part) | 13,846 |
| Belleville city | 3,366 |
| Romulus city | 24,857 |
| Van Buren Township | 18,940 |
| Wayne city | 21,159 |
| | 82,168 |

District 66

*Oakland County*
The following population of Troy city was
moved to create a district.

| | |
|---|---:|
| Troy city (part) | 28,445 |
| Hazel Park city | 20,914 |
| Madison Heights city | 35,375 |
| | 84,734 |

District 26

*Macomb County*
The following population of Sterling Heights
city was moved to create a district.

| | |
|---|---:|
| Sterling Heights city (part) | 20,098 |
| Macomb Township | 14,230 |
| Shelby Township | 38,939 |
| Utica city | 5,282 |
| Washington Township | 10,213 |
| | 88,762 |

District 74

*Macomb County*

The following population of East Detroit city was moved to create a district.

| | |
|---|---:|
| East Detroit city (part) | 7,639 |
| Lake Township | 110 |
| St. Clair Shores city | 76,210 |
| | 83,959 |

District 52

*Washtenaw County*

The following population of the City of Ann Arbor was moved to create a district.

| | |
|---|---:|
| Ann Arbor city (part) | 22,531 |
| Washtenaw County (part) | 66,316 |
| | 88,847 |

District 58

*Ingham County*

The following population of Lansing city was moved to create a district.

| | |
|---|---:|
| Lansing city (part) | 45,387 |
| Ingham County (part) | 45,071 |
| | 90,458 |

District 81

*Genesee County*

The following population of Flint Township was moved to part of the City of Flint to create a district.

| | |
|---|---:|
| Flint Township (part) | 21,270 |
| Flint city (part) | 69,515 |
| | 90,785 |

District 46

*Kalamazoo County*

The following population of Kalamazoo Township was moved to create a district.

| | |
|---|---:|
| Kalamazoo Township (part) | 9,494 |
| Kalamazoo city | 79,722 |
| | 89,216 |

*Summary:* The following cities and townships were split—

| COUNTY | CITY/TOWNSHIP | POPULATION MOVED |
|---|---|---:|
| Wayne | Allen Park city | 15,687 |
| | Westland city | 6,955 |
| | Livonia city | 22,991 |
| | Canton Township | 13,846 |
| Oakland | Troy city | 28,445 |
| Macomb | Sterling Heights city | 20,098 |
| | East Detroit city | 7,639 |
| Washtenaw | Ann Arbor city | 22,531 |
| Ingham | Lansing city | 45,387 |
| Genesee | Flint Township | 21,270 |
| Kalamazoo | Kalamazoo Township | 9,494 |

*Note:* The Cities of Grand Rapids and Warren were also split to create two districts each within each city.

The City of Detroit was also split to create 17 districts within its limits and including Highland Park, Hamtramck, Harper Woods and the Grosse Pointes cities and townships.

APPENDIX B

POPULATION AND VARIANCES

*House*

There are 54 districts under average population and 56 districts over average population.

The average population over an ideal district is 4190.8. The average population under the ideal district is 4346.6. The average variance is 4268.7.

The average percentage variance from ideal is 4.98% over and 5.16% under the average percent of variance is 5.07%.

The median deviation from average is 4955.5.

The difference between the smallest and largest district is 13,774.

The maximum difference from ideal is plus 6870 (8.16%) and minus 6904 (8.20%).

The population of the 56 smallest districts (needed for majority in House) is 4,481,171 which is 48.38%.

There are:
        39 districts within 4% of ideal
        52 districts exceeding 6% of ideal
        32 districts within 3% of ideal
        64 districts exceeding 5% of ideal

The ratio of the largest district to the smallest district is 1.17 to 1.

The number of county breaks is 10.

The number of city/townships moved over a county line is 27.

The number of city/township lines broken is 13.

*Senate*

There are 19 districts over average population and 19 districts under average population.

The average population over and under ideal is 12,264.4 over and 12,264.6 under.

The average variance is 12,264.5.

The percentage variance from ideal is 5.0319% over and 5.0319% under.

The average percentage variance is 5.3061%.

The median deviation from perfect equality for all districts is 14,602.5.

The difference between the largest and smallest district is 39,626.

The maximum deviation (+) from the ideal is 19,788 (8.12%).

The maximum deviation (−) from the ideal is 19,838 (8.14%).

The population of 20 districts with the least population (number necessary to elect majority) is 4,645,051 = 50.15%.

The population of 19 districts with least population (number necessary to elect majority if Lt. Governor is used as tie breaker) is 4,398,013 = 47.48%.

The number of districts within 4.00% of ideal is 14.

Appendix B

The number of districts exceeding 6.00% of ideal is 19.

The number of districts within 3.00% of ideal is 10.

The number of districts exceeding 5.00% of ideal is 22.

The number of county breaks is 4.

The number of city/township moves in the county breaks is 6.

The number of city/township lines broken is 1 (Detroit).

The ratio of the largest district to the smallest district is 1.2 to 1.

Senate

|  | District | Population | Over Average | Under Average | Percent Over Average | Percent Under Average |
|---|---|---|---|---|---|---|
| 1 | 31 | 223,901 | | 19,838 | | 8.13 |
| 2 | 32 | 224,151 | | 19,588 | | 8.03 |
| 3 | 21 | 225,084 | | 18,655 | | 7.65 |
| 4 | 25 | 225,168 | | 18,571 | | 7.61 |
| 5 | 29 | 225,281 | | 18,458 | | 7.57 |
| 6 | 11 | 225,828 | | 17,911 | | 7.34 |
| 7 | 9 | 225,847 | | 17,892 | | 7.34 |
| 8 | 38 | 226,369 | | 17,370 | | 7.12 |
| 9 | 30 | 227,322 | | 16,417 | | 6.73 |
| 10 | 14 | 228,059 | | 15,680 | | 6.43 |
| 11 | 26 | 229,455 | | 14,284 | | 5.86 |
| 12 | 19 | 233,754 | | 9,985 | | 4.09 |
| 13 | 23 | 235,183 | | 8,556 | | 3.51 |
| 14 | 13 | 238,027 | | 5,712 | | 2.34 |
| 15 | 22 | 238,090 | | 5,649 | | 2.31 |
| 16 | 27 | 239,298 | | 4,441 | | 1.82 |
| 17 | 33 | 240,873 | | 2,866 | | 1.17 |
| 18 | 37 | 243,022 | | 717 | | 0.29 |
| 19 | 36 | 243,301 | | 438 | | 0.17 |
| 20 | 20 | 247,038 | 3,299 | | 1.35 | |
| 21 | 35 | 247,847 | 4,108 | | 1.68 | |
| 22 | 34 | 247,964 | 4,225 | | 1.73 | |
| 23 | 28 | 249,629 | 5,890 | | 2.41 | |

APPENDIX B

| | | | | |
|---|---|---|---|---|
| 24 | 15 | 251,935 | 8,196 | 3.36 |
| 25 | 16 | 252,930 | 9,191 | 3.77 |
| 26 | 8 | 253,092 | 9,353 | 3.83 |
| 27 | 17 | 253,836 | 10,097 | 4.14 |
| 28 | 7 | 256,383 | 12,644 | 5.18 |
| 29 | 12 | 258,307 | 14,568 | 5.97 |
| 30 | 24 | 258,376 | 14,637 | 6.00 |
| 31 | 10 | 258,686 | 14,947 | 6.13 |
| 32 | 5 | 259,678 | 15,939 | 6.53 |
| 33 | 3 | 259,821 | 16,082 | 6.59 |
| 34 | 4 | 260,523 | 16,784 | 6.88 |
| 35 | 6 | 260,785 | 17,046 | 6.99 |
| 36 | 2 | 261,582 | 17,843 | 7.32 |
| 37 | 1 | 262,126 | 18,387 | 7.54 |
| 38 | 18 | 263,527 | 19,788 | 8.11 |

HOUSE

| | DISTRICT | POPULATION | OVER AVERAGE | UNDER AVERAGE | PERCENT OVER AVERAGE | PERCENT UNDER AVERAGE |
|---|---|---|---|---|---|---|
| 1 | 7 | 77,297 | | 6,904 | | 8.19 |
| 2 | 6 | 77,375 | | 6,826 | | 8.10 |
| 3 | 21 | 77,376 | | 6,825 | | 8.10 |
| 4 | 50 | 77,479 | | 6,722 | | 7.98 |
| 5 | 1 | 77,483 | | 6,718 | | 7.97 |
| 6 | 10 | 77,484 | | 6,717 | | 7.97 |
| 7 | 3 | 77,502 | | 6,699 | | 7.95 |
| 8 | 15 | 77,527 | | 6,674 | | 7.92 |
| 9 | 13 | 77,560 | | 6,641 | | 7.88 |
| 10 | 29 | 77,568 | | 6,633 | | 7.87 |
| 11 | 16 | 77,601 | | 6,600 | | 7.83 |
| 12 | 38 | 77,648 | | 6,553 | | 7.78 |
| 13 | 17 | 77,657 | | 6,544 | | 7.77 |
| 14 | 2 | 77,672 | | 6,529 | | 7.75 |
| 15 | 5 | 77,718 | | 6,483 | | 7.69 |
| 16 | 8 | 77,755 | | 6,446 | | 7.65 |
| 17 | 33 | 77,785 | | 6,416 | | 7.61 |
| 18 | 14 | 77,868 | | 6,333 | | 7.52 |
| 19 | 9 | 77,946 | | 6,255 | | 7.42 |
| 20 | 12 | 77,990 | | 6.211 | | 7.37 |
| 21 | 4 | 78,086 | | 6,115 | | 7.26 |
| 22 | 39 | 78,244 | | 5,957 | | 7.07 |
| 23 | 23 | 78,316 | | 5,885 | | 6.98 |
| 24 | 11 | 78,377 | | 5,824 | | 6.91 |
| 25 | 55 | 78,475 | | 5,726 | | 6.80 |
| 26 | 97 | 78,587 | | 5,614 | | 6.66 |
| 27 | 95 | 78,699 | | 5,502 | | 6.53 |
| 28 | 24 | 78,970 | | 5,231 | | 6.21 |
| 29 | 96 | 79,002 | | 5,199 | | 6.17 |
| 30 | 102 | 79,211 | | 4,990 | | 5.92 |
| 31 | 105 | 79,448 | | 4,753 | | 5.64 |
| 32 | 84 | 79,781 | | 4,420 | | 5.24 |
| 33 | 104 | 79,858 | | 4,343 | | 5.15 |

APPENDIX B

| | District | Population | Over Average | Under Average | Percent Over Average | Percent Under Average |
|---|---|---|---|---|---|---|
| 34 | 64 | 80,207 | | 3,994 | | 4.74 |
| 35 | 87 | 80,362 | | 3,839 | | 4.55 |
| 36 | 34 | 81,432 | | 2,769 | | 3.28 |
| 37 | 45 | 81,575 | | 2,626 | | 3.11 |
| 38 | 62 | 81,747 | | 2,454 | | 2.91 |
| 39 | 35 | 81,823 | | 2,378 | | 2.82 |
| 40 | 60 | 81,962 | | 2,239 | | 2.65 |
| 41 | 37 | 82,168 | | 2,033 | | 2.41 |
| 42 | 41 | 82,259 | | 1,942 | | 2.30 |
| 43 | 19 | 82,472 | | 1,729 | | 2.05 |
| 44 | 108 | 82,585 | | 1,616 | | 1.91 |
| 45 | 98 | 82,591 | | 1,610 | | 1.91 |
| 46 | 110 | 83,017 | | 1,184 | | 1.40 |
| 47 | 32 | 83,393 | | 808 | | 0.95 |
| 48 | 77 | 83,677 | | 524 | | 0.62 |
| 49 | 36 | 83,684 | | 517 | | 0.61 |
| 50 | 103 | 83,791 | | 410 | | 0.48 |
| 51 | 70 | 83,829 | | 372 | | 0.44 |
| 52 | 74 | 82,959 | | 242 | | 0.28 |
| 53 | 69 | 84,109 | | 92 | | 0.10 |
| 54 | 65 | 84,148 | | 53 | | 0.06 |
| 55 | 106 | 84,463 | 262 | | 0.31 | |
| 56 | 30 | 84,573 | 372 | | 0.44 | |
| 57 | 61 | 84,635 | 434 | | 0.51 | |
| 58 | 66 | 84,734 | 533 | | 0.63 | |
| 59 | 28 | 84,786 | 585 | | 0.69 | |
| 60 | 73 | 84,952 | 751 | | 0.89 | |
| 61 | 85 | 84,990 | 789 | | 0.93 | |
| 62 | 44 | 85,524 | 1,323 | | 1.57 | |
| 63 | 18 | 85,572 | 1,371 | | 1.62 | |
| 64 | 86 | 85,682 | 1,481 | | 1.75 | |
| 65 | 93 | 85,752 | 1,551 | | 1.84 | |
| 66 | 20 | 86,307 | 2,106 | | 2.50 | |
| 67 | 25 | 86,598 | 2,397 | | 2.84 | |
| 68 | 63 | 86,639 | 2,438 | | 2.89 | |
| 69 | 107 | 86,658 | 2,457 | | 2.91 | |
| 70 | 72 | 86,960 | 2,759 | | 3.27 | |
| 71 | 100 | 86,975 | 2,774 | | 3.29 | |
| 72 | 47 | 86,990 | 2,789 | | 3.31 | |
| 73 | 94 | 87,116 | 2,915 | | 3.43 | |
| 74 | 22 | 87,376 | 3,175 | | 3.77 | |
| 75 | 90 | 87,667 | 3,466 | | 4.11 | |
| 76 | 91 | 87,880 | 3,679 | | 4.36 | |
| 77 | 48 | 87,970 | 3,769 | | 4.47 | |
| 78 | 54 | 88,104 | 3,903 | | 4.63 | |
| 79 | 56 | 88,337 | 4,136 | | 4.91 | |
| 80 | 52 | 88,525 | 4,324 | | 5.13 | |
| 81 | 76 | 88,624 | 4,423 | | 5.25 | |
| 82 | 26 | 88,762 | 4,561 | | 5.41 | |
| 83 | 53 | 88,847 | 4,646 | | 5.51 | |

| 84 | 71 | 88,901 | 4,700 | 5.58 |
|---|---|---|---|---|
| 85 | 67 | 89,122 | 4,921 | 5.84 |
| 86 | 68 | 89,213 | 5,012 | 5.95 |
| 87 | 46 | 89,216 | 5,015 | 5.95 |
| 88 | 79 | 89,274 | 5,073 | 6.02 |
| 89 | 49 | 89,759 | 5,558 | 6.60 |
| 90 | 82 | 89,868 | 5,667 | 6.73 |
| 91 | 40 | 89,948 | 5,747 | 6.82 |
| 92 | 59 | 90,078 | 5,877 | 6.97 |
| 93 | 81 | 90,096 | 5,895 | 7.00 |
| 94 | 101 | 90,293 | 6,092 | 7.23 |
| 95 | 83 | 90,426 | 6,225 | 7.39 |
| 96 | 58 | 90,458 | 6,257 | 7.43 |
| 97 | 109 | 90,489 | 6,288 | 7.46 |
| 98 | 27 | 90,512 | 6,311 | 7.49 |
| 99 | 75 | 90,639 | 6,438 | 7.64 |
| 100 | 31 | 90,660 | 6,459 | 7.67 |
| 101 | 57 | 90,684 | 6,483 | 7.69 |
| 102 | 89 | 90,708 | 6,507 | 7.72 |
| 103 | 81 | 90,785 | 6,584 | 7.81 |
| 104 | 92 | 90,812 | 6,611 | 7.85 |
| 105 | 42 | 90,821 | 6,620 | 7.86 |
| 106 | 78 | 90,967 | 6,766 | 8.03 |
| 107 | 93 | 91,031 | 6,830 | 8.11 |
| 108 | 88 | 91,047 | 6,846 | 8.13 |
| 109 | 51 | 91,067 | 6,866 | 8.15 |
| 110 | 99 | 91,071 | 6,870 | 8.15 |

## Final Order

Entered May 21, 1982.—Reporter.

In this matter, having heard oral arguments by petitioners and respondents on March 5, 1982, and by petitioners and respondents and other interested persons on May 5, 1982, and

Having considered briefs filed by petitioners and respondents and written presentations filed by all other interested persons, and

Having considered certain modifications to the plans submitted to the Court for approval by Bernard J. Apol on April 27 and 29, 1982, and

Because no showing has been made that the modifications "do not cause the plans submitted on

April 27 and 29 to be more compliant with the rules and standards set forth in this Court's opinion" of March 25, 1982, and

Petitioner's motion for rehearing having been denied this date,

Now therefore, pursuant to the Court's opinion filed on March 25, 1982, the judgment order entered thereon as of the same date, and the orders of the Court dated February 3, 18 and 24, March 4, 5 and 19, April 30 and May 13, all 1982, it is hereby ordered and the Secretary of State is directed to publish as provided by law and hold the legislative elections for this year in accordance with the redistricting and reapportionment plans hereby approved and particularly described in the next paragraph.

The plans approved are:

1. The plans submitted to this Court for approval by Bernard J. Apol; for the Senate under the date of April 27, 1982, and for the House of Representatives under date of April 29, 1982;

2. Substituting for the provisions of parts of the said plans dated April 27 and 29, the superseding provisions of the modifications dated and submitted by Bernard J. Apol for Court approval on May 12, 1982.

The clerk of this Court is directed to deliver forthwith to the office of the Secretary of State certified true copies of this order and of the approved plans and modifications.

The Court retains jurisdiction for the purpose of taking such affirmative action as may be necessary

to insure an orderly election in 1982 pursuant to a constitutionally valid plan.

BLAIR MOODY, JR., J. *(dissenting).* I respectfully dissent from the final order of the Court. The law requires a closer adherence to the constitutional principle of "one person, one vote".

A majority of the Court has decided to adopt a modified reapportionment plan for the Michigan Senate and Michigan House of Representatives. Today's order does not adopt any changes in the criteria of our March 25 opinion directing the drawing of reapportionment plans under the supervision of Bernard J. Apol. *In re Apportionment of State Legislature—1982, ante,* p 96.

I join my colleagues in reaffirming the basic thrust of our opinion of March 25, which squarely faced the problem of an invalid apportionment scheme under our constitution and provided for the development of an apportionment plan to assure an orderly election in 1982.

However, this Court should approve a plan which would adhere to our duty to establish population as "the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies". *Reynolds v Sims,* 377 US 533, 567; 84 S Ct 1362; 12 L Ed 2d 506 (1964). Such a plan would necessitate the modification of the criteria in just one respect, the allowable population divergence. The Court had ample time to adopt an impartial plan which would not exalt district representation over people representation.

Acting under its equitable judicial power,[1] the Court established in its opinion of March 25 the following primary criteria:

"Senate and House election district lines shall preserve county lines with the least cost to the federal principle of equality of population between election districts consistent with the maximum preservation of county lines and without exceeding the range of allowable divergence under the federal constitution which, until the United States Supreme Court declares otherwise, shall be deemed to be 16.4% (91.8%-108.2%).

"Where it is necessary to break county lines, because otherwise the range of allowable divergence would be exceeded, there shall be shifted the fewest *cities or* townships necessary to reduce the population divergence sufficiently to bring it within the range of allowable divergence.

"Because of the narrowness of the range of allowable divergence, we anticipate that only one plan will organize the counties with the least breaking of county lines." (Italicized language added after March 25.) *Ante,* p 141.

The allowable population divergence of 16.4% (+8.2%) was lifted from *Mahan v Howell,* 410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973). *Mahan* held that a plan for the Virginia House of Delegates which included an extreme allowable total deviation of 16.4% (+6.8%, −9.6%) was not unconstitutional. Written in the abstract, prima facie, such a deviation may be equitably and constitutionally acceptable. However, upon application in this state and in this case, the anticipated

---

[1] Const 1963, art 6, § 1.

extreme divergence became commonplace. The perceived exception virtually became the norm.

A factual analysis of the Court's plan reveals a devastating impact upon the principle of population equality. Application of the allowable population deviation in the Court's plan results in substantial dilution or enhancement of votes in many districts throughout the state. An allowable deviation of 16.4% as applied to Michigan Senate districts which have an ideal population of 243,739 is $\pm$19,987 persons ($\pm$8.2%). This amounts to a total potential deviation from the average of almost 40,000 persons among Senate districts. The 16.4% deviation as applied to Michigan House districts with an ideal population of 84,201 is $\pm$6,904. This results in a potential variance of almost 14,000 persons among House districts.

Under the plan drawn and now approved by the Court, the total deviation between the largest and smallest Senate districts is 39,626 persons (16.26%). The largest district in terms of population, *i.e.,* where each vote is worth the least, has a deviation exceeding the ideal by 19,788 (+8.12%); the smallest, *i.e.,* where each vote is worth the most, is 19,838 persons (−8.14%) less than the ideal. A similar result is reflected in the House plan. The most populous district has a deviation of 6,870 (+8.16%); the smallest is 6,904 persons (−8.2%) under the ideal-sized House district. The total maximum population deviation is 13,774 (16.36%).

It becomes difficult to swallow the conclusion that a difference between Senate districts of 39,626 persons and House districts of 13,774 persons is equitable and does not impair the principle of

equal representation. Yet, if these results truly were the exception and only occurred in the rare occasion, perhaps they would be equitably and constitutionally digestible.

What is of special significance, however, is that a great number of districts have a substantial population deviation from the ideal-sized district and fall near the extremes of the allowable divergence.

Twenty-three of 38 Senate districts have a population deviation in excess of 10,000 persons ($\pm$4.1%). Eleven of these districts fall that far below an ideal-sized district. Twelve have more than 10,000 persons above a district with perfect equality of population. Considering another comparison, 22 of 38 districts have a population deviation in excess of 12,187 ($\pm$5%). Eleven districts have a greater than 5% deviation above the ideal, and 11 fall more than 5% below the ideal. In addition, 24 Senate districts out of 38 have a deviation in excess of 9,750 persons ($\pm$4%). Finally, the average deviation from the ideal-sized district of 243,739 is 12,265 persons ($\pm$5.03%).

This is not the case where a substantial deviation from the norm is unusual. Unfortunately the plan, once unfolded, resulted in many population differentials which gravitated toward the extremes.

A similar pattern is reflected as to House districts. The average percentage variation from the ideal-sized district of 84,201 is $\pm$5.07%. Translated into persons, this reflects that there is an average deviation of 4,267 persons per House district. Fifty-four of 110 House districts have a population

deviation in excess of 5,000 persons ($\pm$5.94%). Sixty-four of 110 have a population deviation in excess of 4,210 persons ($\pm$5%). Seventy-one have a deviation in excess of 3,368 ($\pm$4%).

It becomes apparent that the application of the Court's criteria accentuates the extreme and not the norm. Restricting the allowable population divergence would in great measure establish population equality as the primary principle to be recognized.

The plan of the Court fails to measure up to the constitutional requirement that a court-ordered reapportionment plan should formulate districts that are "as nearly of equal population as is practicable". In *Mahan,* upon analyzing the reapportionment plan for the Virginia House of Delegates, the United States Supreme Court discussed several methods of measuring population equality. One measure, the population ratio between the largest and smallest district, is the same in the Michigan plan as in *Mahan,* 1.18 to 1, since this plan was patterned after *Mahan.*

However, applying other population relationships discussed in *Mahan* to the Michigan plan dramatizes its constitutional deficiency. In the Michigan Senate plan, the average percentage variation from perfect equality is $+5.03$%. (That is 12,265 persons from the ideal-sized district). In the House plan, the average percentage deviation is $+5.07$%. (That is 4,269 persons from the ideal district). In *Mahan,* the average deviation was only $+3.89$%.

Also of significance, as has been emphasized, are the number of districts which fall near the ex-

treme of the allowable deviation. In the plan of the Court, 19 of 38 Senate districts (50%) and 52 of 110 House districts (47.27%) have a population deviation greater than 6%. Only 9 out of 52 districts (17.3%) had the same deviation in *Mahan.* Furthermore, only 14 of 38 Michigan Senate districts (36.84%) and 39 of 110 House districts (35.45%) fall within 4% of the ideal, whereas in *Mahan,* the figure was significantly higher: 35 out of 52 districts (67.31%).

Thus, the surface 16.4% standard of *Mahan* is but the tip of the iceberg of an appropriate constitutional evaluation. While the 16.4% standard of *Mahan* may be met, "the fact that a 10% or 15% variation from the norm is approved in one State has little bearing on the validity of a similar variation in another State". *Swann v Adams,* 385 US 440, 445; 87 S Ct 569; 17 L Ed 2d 501 (1967), quoted in *Mahan v Howell, supra,* 328.

An unfolding of the Court's plan reflects that close adherence to a percentage deviation that is at the outside limits of constitutionality cannot be squared with the overriding constitutional objective of substantial equality of population among districts. The reapportionment criteria should strive to create districts as equal, not as unequal, as possible.

"Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Reynolds, supra,* 568. Such a conclusion becomes more self-evident when a substantial divergence from an ideal-sized dis-

trict is present in the majority of Senate and House districts.

Today's plan follows the Court's opinion as closely as possible within self-imposed time constraints. Mr. Apol performed admirable service following the Court's directives. However, rigid adherence to the criteria concerning population deviation and county lines, written in the abstract, is not required, nor is it advised, when modifications may be made to comport substantially closer to the primary principle of population equality. The Court should profess no vested interest in a certain allowable divergence when experience shows it can be substantially improved to assure constitutional acceptability and still achieve an impartial plan.

Such a modified plan could have been devised following the same boundary line criteria outlined in the reapportionment opinion, but permitting only a *de minimis* deviation from population equality. *Cf. Gaffney v Cummings,* 412 US 735; 93 S Ct 2321; 37 L Ed 2d 298 (1973); *White v Regester,* 412 US 755; 93 S Ct 2332; 37 L Ed 2d 314 (1973); *Apportionment of Wayne County Board of Comm'rs—1982, post,* p 289 (Blair Moody, Jr., J., *dissenting).*

A total allowable divergence of 5% ($\pm$2.5%) would certainly fall within permissible standards. Reducing the total allowable divergence to 8% ($\pm$4%) would eliminate much of the inequality extant in the present plan. Since the other criteria of the Court, particularly as interpreted by the majority, gravitates population differentials toward outside allowable limits, any further divergence would be potentially excessive. It is apparent more

county lines would be broken than under the Court's plan. However, population equality within acceptable limits should take precedence over unbroken county lines.

The importance of moving to a quick conclusion of this problem is recognized. However, a "rush to judgment" may not fully serve the citizens of this state. Time was available[2] to develop a plan allowing only a *de minimis* population deviation which follows the requirements of the Equal Protection Clause—one that does not include constitutionally unacceptable line-drawing.

Reasonable adherence to boundary lines is a legitimate and useful method in an effort to minimize deliberate gerrymandering and has a genesis in Michigan history. The Court in its opinion of March 25 adopted criteria with respect to boundary lines in order to aid in the drafting of a neutral reapportionment plan.

"But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired". *Reynolds, supra,* 581. Thus, this Court cannot, under the guise of "state policy", supersede the constitutional principle of substantial equality among election districts. *Connor v Finch,* 431 US 407, 420; 97 S Ct 1828; 52 L Ed 2d 465 (1977).

[2] The Court was advised it would take only one week to develop such a plan.

A. substantial movement away from population equality in so·many districts caused by excessive adherence to boundary lines turns the "constitutional requirement of equality on its head and exalt[s] district representation over people representation". *Apportionment of Wayne County, post,* p 277 (BLAIR MOODY, JR., J., *dissenting).*

As was stated in *Reynolds, supra,* 566, "a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us".

For the foregoing reasons, I dissent from the adoption of the Court's plan and would, in lieu of granting the motion for rehearing, reduce the allowable population divergence in the opinion of March 25 and direct the redrafting of a plan under such modification.

ORDER DENYING STAY

Entered May 24, 1982.—REPORTER.

On order of the Court, the *ex parte* application by Commissioners Kleiner, Board, Brouillette and Lurvey for stay pending United States Supreme Court appeal is considered and is hereby denied.

Justices LEVIN and FITZGERALD concur and say:

The Democratic members of the Commission on Legislative Apportionment have filed a motion for a stay of this Court's judgment of March 25 and order of May 21 pending their appeal to and decision by the United States Supreme Court, and have asked this Court in the interim to direct the continuation of the existing legislative districts or the adoption of one of the plans submitted by the

Democratic members of the apportionment commission.

While this Court should ordinarily take whatever action will facilitate full exercise of the right to appeal from this Court's decision, this Court cannot in the instant case grant a stay without immediately ordering the implementation of some alternative for this year's election (either a further delay in the primary, an extension of the terms of legislators, a continuation of the 1972 apportioned legislative districts, an election at large, or adoption of another districting and apportionment plan) inconsistent with the decision of this Court, thereby granting, because an appeal has been taken, relief denied on the merits. A stay should, therefore, be denied.